# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# PENSACOLA DIVISION

PRESIDENT DONALD J. TRUMP, 45th President
of the United States of America, in his individual
capacity,

Plaintiff,

v.                                                             3:23-cv-02333-MCR-ZCB

SIMON & SCHUSTER, INC., a New York
corporation, ROBERT WOODWARD p.k.a. BOB
WOODWARD, an individual, and PARAMOUNT
GLOBAL, a Delaware corporation, f/k/a Viacom
Inc., successor by merger to CBS Corporation, a
Pennsylvania corporation f/k/a Westinghouse
Electric Corporation,

Defendants.

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 12(B)(6) MOTION TO DISMISS THE AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

FACTUAL BACKGROUND.....................................................................4

    **A.**    Woodward Interviews President Trump and Publishes *Rage* ................4

    **B.**    Woodward Creates the Work Using His Raw Interviews and Extensive Supplemental Material ...........................................................10

    **C.**    The Amended Complaint....................................................12

ARGUMENT .....................................................................................13

  I.   THE COPYRIGHT CLAIMS FAIL BECAUSE PRESIDENT TRUMP LACKS A VALID COPYRIGHT REGISTRATION...................................13

 II.   PRESIDENT TRUMP DOES NOT OWN A COPYRIGHT IN WOODWARD'S INTERVIEWS OR WORK.............................................14

    **A.**    Woodward Is the Copyright Owner, Not President Trump...................14

    **B.**    President Trump Cannot Own His Interview Responses Because They Are Government Works under Copyright Law .....................................19

III.  THE PUBLICATION OF THE WORK WAS FAIR USE..........................26

IV.  THE STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT ..............................................................................................29

    **A.**    The State Law Claims Are Barred by Conflict Preemption .................29

    **B.**    The State Law Claims Are Expressly Preempted by 17 U.S.C. § 301..32

    **1.**    The Unfair Competition Claims Are Preempted by Section 301 .........33

    **2.**    The Contract Claims Are Preempted by Section 301 ...........................35

  V.   THE STATE LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION .....................................................36

    **A.**    The Contract Claims Are Meritless .....................................37

    **B.**    The Unfair Competition Claims Are Meritless ....................................39

VI.  NO VOLITIONAL CONDUCT WAS PLEADED AGAINST PARAMOUNT .................................................................................41

CONCLUSION..................................................................................42

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*16 Casa Duse v. Merkin,*
  791 F.3d 247 (2d Cir. 2015) ......................................................17, 19

*Aalmuhammed v. Lee,*
  202 F.3d 1227 (9th Cir. 2000) ..........................................................16

*ADA v. Cigna Corp,*
  605 F.3d 1283 (11th Cir. 2010) .........................................................20

*Am. Geophysical Union v. Texaco,*
  60 F.3d 913 (2d Cir. 1994) ...............................................................28

*Andy Warhol Found. for Visual Arts v. Goldsmith,*
  -- S.Ct. --, 2023 WL 3511534 (U.S. May 18, 2023)...........................27

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..........................................................................20

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 554 (2007).....................................................................36, 37

*Bongino v. Daily Beast Co.,*
  477 F. Supp. 3d 1310 (S.D. Fla. 2020) ..............................................40

*Bonito Boats v. Thunder Craft Boats,*
  489 U.S. 141 (1989)..........................................................................30

*Briarpatch Ltd. v. Phoenix Pictures,*
  373 F.3d 296 (2d Cir. 2004) .........................................................34, 36

*Cmty. For Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989).....................................................................15, 17

*Comercial Ltda v. BPI Sports,*
  2016 WL 9375202 (S.D. Fla. Aug. 11, 2016) ....................................40

*Compco v. Day-Brite Lighting,*
  376 U.S. 234 (1964)..........................................................................30

*Coral Ridge Ministries Media v. Amazon.com*,
  6 F.4th 1247 (11th Cir. 2022) .......................................................20, 23

*Council on Am. Islamic Rels. v. Ballenger*,
  444 F.3d 659 (D.C. Cir. 2006)...............................................................23

*Current Audio v. RCA*,
  71 Misc. 2d 831 (Sup. Ct. N.Y. Cnty. 1972)........................................16

*Dahlgren v Muldrow*,
  2007 WL 2827671 (N.D. Fla. Sept. 27, 2007) ........................................4

*Dish Network v. TV Net Solutions*,
  2014 WL 6685351 (M.D. Fla. Nov. 25, 2014)......................................32

*Doe v. Samford Univ.*,
  29 F.4th 675 (11th Cir. 2022) ...............................................................20

*Dowbenko v. Google*,
  582 F. App'x 801 (11th Cir. 2014).......................................................14

*Estate of Hemingway v. Random House*,
  23 N.Y.2d 341 (N.Y. 1968) ..................................................................17

*Extraordinary Title Servs v. Fla. Power & Light*,
  1 So. 3d 400 (Fla. DCA 3rd 2009).......................................................42

*Fastcase, v. Lawriter*,
  907 F.3d 1335 (11th Cir. 2018) ............................................................14

*Five for Ent. v. Rodriguez*,
  877 F. Supp. 2d 1321 (S.D. Fla. 2012).................................................40

*Foley v. Luster*,
  249 F.3d 1281 (11th Cir. 2001) ................................................29, 30, 33

*Fourth Estate Pub. Ben. Corp. v. Wall-Street.com*,
  139 S. Ct. 881 (2019).............................................................................13

*Garcia v. Google*,
  786 F.3d 733 (9th Cir. 2014) (en banc) ...................................15, 18, 25

*Garrett-Alfred v. Facebook*,
  540 F. Supp. 3d 1129 (M.D. Fla. 2021)................................................................40

*Gary Friedrich Enter. v. Marvel Enter.*,
  713 F. Supp. 2d 215 (S.D.N.Y. 2010) ................................................................35

*Georgia v. Public.Resource.Org*,
  140 S. Ct. 1498 (2020)................................................................................19, 25

*Gharib v. Wolf*,
  518 F. Supp. 2d 50 (D.D.C. 2007)................................................................39

*Goldstein v. California*,
  412 U.S. 546 (1973)................................................................................30

*Google v. Oracle*,
  141 S. Ct. 1183 (2021)................................................................................28

*Guerroro v. Target*,
  889 F. Supp. 2d 1348 (S.D. Fla. 2012) ................................................................41

*Hanson Hams v. HBH Franchise Co.*
  2004 WL 5470401 (S.D. Fla. Dec. 21, 2004)................................................................40

*Harper & Row v. Nation Enter.*,
  471 U.S. 539 (1985)................................................................................21

*Hello I am Elliot, Inc. v. Sine*,
  2020 WL 3619505 (S.D.N.Y. July 2, 2020)................................................................14

*Herbert v. U.S.*,
  36 Fed. Cl. 299 (Ct. Claims 1996)................................................................21

*ICC Evaluation Serv. v. Int'l Ass'n of Plumbing & Mech. Offs.*,
  2016 WL 11769565 (D.D.C. Sept. 19, 2016)................................................................33, 36

*Jaggon v. Rebel Rock Ent.*,
  2010 WL 3468101 (S.D. Fla. Sept. 1, 2010) ................................................................34

*Kauffman v. Int'l. Bhd. of Teamsters*,
  950 A.2d 44 (D.C. 2008) ................................................................39

*Lipscher v. LRP Publ'ns*,
  266 F.3d 1305 (11th Cir. 2001) .......................................................36

*Millennium Travel & Promotions v. Classic Promotions & Premiums*,
  2008 WL 2275555 (M.D. Fla. June 2, 2008) ....................................35

*MiZioznikov v. Forte*,
  2017 WL 5642383 (S.D. Fla. Mar. 27, 2017) ...................................28

*Montgomery v. Wells Fargo Bank*,
  2017 WL 5127715 (N.D. Ala. Nov. 6, 2017) .....................................38

*Myers v. Fabrics*,
  101 A.D.2d 777 (N.Y. App. Div. 1984), *aff'd in relevant part*, 65 N.Y.2d 75
  (1985) .................................................................................................39

*Nixon v. Richey*,
  513 F.2d 430 (D.C. Cir. 1975) .........................................................25

*Nixon v. Sampson*,
  389 F. Supp. 107 (D.D.C. 1975) ......................................................25

*Pac. and South. Co., v. Duncan*,
  792 F.2d 1013 (11th Cir. 1986) .......................................................16

*Pegasus Imaging v. Northrop Grumman*,
  2008 WL 5099691 (M.D. Fla. Nov. 25, 2008) ..................................41

*Pegasus Imaging v. Northrup Grumman*,
  2008 WL 2268323 (M.D. Fla. June 2, 2008) ....................................42

*Pena-Rivera v. Ed. Am. S.A.*,
  1997 WL 363975 (S.D. Fla. May 5, 1997) ........................................34

*Poet Theatricals Marine v. Celebrity Cruises*,
  2023 U.S. App. LEXIS 11836 (11th Cir. May 15, 2023) ...................29

*Psychic Readers Network v. Take-Two Interactive Software*,
  2018 WL 1517690 (S.D. Fla. Feb. 5, 2018) ......................................34

*Public Affairs Assocs. v. Rickover*,
  268 F. Supp. 444 (D.D.C. 1967) ..................................................21, 23

*Public Affairs Assocs. v. Rickover*,
  369 U.S. 111 (1962)............................................................................21

*Reed Elsevier, Inc. v. Muchnick*,
  559 U.S. 154 (2010)............................................................................14

*Ross v. Apple*,
  2016 WL 8808769 (S.D. Fla. Dec. 30, 2016)....................................34

*Sears Roebuck & Co v. Stiffel Co.*,
  376 U.S. 225 (1964)............................................................................30

*SFM Holdings v. Banc of Amer. Sec.*,
  600 F.3d 1334 (11th Cir. 2010) ...........................................................4

*Sieger Suarez Architectural P'ship v. Arquitectonica Int'l*,
  998 F. Supp. 2d 1340 (S.D. Fla. 2014) ................................................4

*Sonders v. Roosevelt*,
  64 N.Y.2d 869 (N.Y. 1985) ................................................................39

*Strauss v. NewMarket Global Consult. Gp.*,
  5 A.3d 1027 (D.C. 2010) ....................................................................37

*Streeter v. City of Pensacola*,
  2007 WL 4468705 (N.D. Fla. Dec. 18, 2007).....................................24

*Stripteaser. v. Strike Point Tackle*,
  2014 WL 866396 (S.D. Fla. Mar. 5, 2014) .........................................35

*Stuart Weitzman, LLC v. Microcomputer Res.*,
  542 F.3d 859 (11th Cir. 2008) ...........................................................14

*Suid v. Newsweek*,
  503 F. Supp. 146 (D.D.C. 1980)........................................................17

*Swatch Group Mgmt. Serv. v. Bloomberg L.P.*,
  756 F.3d 73 (2d Cir. 2014) ...........................................................27, 28

*Taggart v. WMAQ Channel 5 Chicago*,
  2000 WL 1923322 (S.D. Ill. Oct. 30, 2000).......................................15

*Truman v. Brown*,
    434 F. Supp. 3d 100 (S.D.N.Y. 2020) ................................................39

*Trump v. Carroll*,
    2023 WL 2920882 (D.C. Apr. 13, 2023).........................................23

*United States v. Bestfoods*,
    524 U.S. 51 (1998).........................................................................41

*United States v. Navarro*,
    2023 WL 2424625 (D.D.C. Mar. 9, 2023) .......................................24

*Vault Corp. v. Quaid Software*,
    847 F.2d 255 (5th Cir. 1988) ..........................................................30

*Zimmerman v. Al Jazeera Am.*,
    246 F. Supp. 3d 257 (D.D.C. 2017)................................................35

**Statutes**

17 U.S.C. § 101 ..............................................................................15, 19

17 U.S.C. § 102(a) ................................................................................33

17 U.S.C. § 105 .....................................................................................19

17 U.S.C. § 105(a) ................................................................................29

17 U.S.C. § 107 .....................................................................................26

17 U.S.C. § 201(a) ................................................................................15

17 U.S.C. § 301 ..............................................................................*passim*

28 U.S.C. § 1498 ...................................................................................21

44 U.S.C. § 2201(2) ..............................................................................24

44 U.S.C. § 2202 ...................................................................................24

D.C. Code Ann. § 28-3502 ....................................................................38

Fla. Stat. § 501.203(8)...........................................................................40

Fla. Stat. § 501.204(1)...........................................................................40

Presidential Records Act of 1978, 44 U.S.C. §§ 2201-2209 ...................................24

**Other Authorities**

*1 Nimmer on Copyright* § 1.01[B][1][a] (1997) ......................................................36

Federal Rule of Civil Procedure 8(a)(2) .................................................................20

Federal Rule of Evidence 201(b) ...........................................................................4

H.R. Rep. No. 94-1476 (1976)...............................................................19, 21, 31

M.C. Amerine, *Wrestling Over Republication Rights: Who Owns the Copyright of Interview?*, 21 MARQ. INTELL. PROP. L. REV. 159 (2017) ...................................17

6 *Patry On Copyright* §18:51 (2023).......................................................................34

## INTRODUCTION

For more than two centuries, Presidents of the United States have relied on journalists to communicate their views to their constituents.  On May 4, 1789, *The Hartford Courant* published President Washington's inaugural speech to Congress.  During the Civil War, an interview with President Lincoln was published to explain why Black troops should be permitted to fight for the Union.  *An Interview with the President*, N.Y. TIMES (Sept. 8, 1864).  With modern technology, audiences have become accustomed to hearing their leaders directly via radio, television, online news, and social media.  Presidents from Kennedy to Biden have spoken to the nation through interviews conducted by reporters like Walter Cronkite, Barbara Walters, and Bob Woodward.  Far from being passive bystanders in these conversations, journalists frame the agenda, ask tough questions, and contextualize Presidents' responses.  Ultimately, this long tradition of candid reporting depends on an axiomatic principle—reflected in copyright law—that the words a sitting President speaks while discussing his duties are not private property, but rather belong to the People.

No President before Donald Trump has ever claimed to own a copyright in presidential interviews or demanded royalties for their republication.  Yet President Trump has filed a copyright lawsuit against Bob Woodward ("Woodward"), Simon & Schuster ("S&S"), and Paramount Global ("Paramount") (collectively

"Defendants") for publishing *The Trump Tapes* (the "Work").  In the final year of the Trump Administration, Woodward, one of this country's most prominent journalists, conducted a series of nineteen interviews with President Trump (the "Interviews").  Woodward was the sole architect and true author of the Interviews— it was he who devised the questions, who decided when to press President Trump (or when to let him speak unchallenged), and who ultimately preserved the Interviews for posterity by tape recording them.

As Woodward notes in the Work, he relistened to the Interviews after President Trump left office and decided "to put as much of Trump's voice, his own words, out there for the historical record," including the then-President's views on a range of the key political issues facing the country.  But Woodward did not simply publish the raw Interviews.  Rather, to achieve his historical purpose, Woodward edited the Interviews for clarity, succinctness, and sound quality, and authored original content, including 227 "commentaries" offering critical context, and an Introduction and Epilogue that seek to define President Trump's place in the pantheon of Presidents.  The Work was published as an audiobook and as a substantively identical text edition (subtitled *The Historical Record*).  As Woodward concluded in the Work, "Trump's view of the presidency that comes across over and over again in our interviews" is that "'[e]verything is mine.'…The presidency is mine.  It is *still* mine.  The only view that matters is mine."  *See* Ex. A, 414.

As if on a mission to prove this "everything is mine" thesis, Donald Trump, "in his individual capacity," asserts that he owns Woodward's entire Work because it includes words spoken by "President Trump, 45th President of the United States of America."  And President Trump seeks to profit from his public service by demanding Defendants pay him nearly $50 million.  But the Amended Complaint ("Am.Comp.") ignores Woodward's role as the author of both the Interviews and the Work.  Further, this lawsuit offends the basic principle codified in the Copyright Act that government officials cannot own the words they speak while carrying out official duties.

President Trump's Amended Complaint has no legal merit.  Counts I and II (the "Copyright Claims") fail because President Trump failed to obtain a copyright registration prior to filing suit.  *See* POINT I.  For the foregoing reasons, President Trump's Copyright Claims also fail on their merits.  *See* POINT II.  Further, as a matter of law it was a fair use to quote the President in the Work.  *See* POINT III. Counts III through IX (the "State Law Claims") fare no better.  The common thread is that Woodward allegedly violated a promise that he would use his recordings exclusively for his book *Rage*, published two years before the Work.  But the Interviews themselves make clear that no such promise was made and that Woodward was under no obligation to mothball his Interviews.  Further, the State Law Claims are preempted by the Copyright Act and fail to state a cognizable cause

3

of action (*see* POINTS IV-V).    Finally, the claims against Paramount Global ("Paramount") fail because the Amended Complaint fails to allege that it, as S&S's parent company, played an actionable role in the Work's publication.  *See* POINT VI.

President Trump's unprecedented effort to extract private benefit from his public duties should be dismissed in its entirety.

## FACTUAL BACKGROUND

### A.    Woodward Interviews President Trump and Publishes *Rage*

For more than 50 years, Bob Woodward has covered Presidents and politics for *The Washington Post*.  Woodward—who has shared two Pulitzer Prizes—came to prominence by publishing groundbreaking reporting about President Nixon's role in Watergate with his *Post* colleague, Carl Bernstein, which served as the basis for their 1974 classic *All the President's Men*.  Woodward has "written books about 10 presidents from Nixon to Biden" and "interviewed Presidents Carter, Clinton, George W. Bush, and Obama" in the Oval Office.  *See* Ex. A, 417.[1]  In September 2018, Woodward published *Fear: Trump in the White House*, which chronicled the

---

[1] The Work is incorporated by reference and can be properly considered on a Rule 12(b)(6) motion.  *SFM Holdings v. Banc of Amer. Sec.*, 600 F.3d 1334, 1337 (11th Cir. 2010); *Sieger Suarez Architectural P'ship v. Arquitectonica Int'l*, 998 F. Supp. 2d 1340, 1349 (S.D. Fla. 2014).  This Court can take judicial notice of Woodward's bibliography because it is "not subject to reasonable dispute."  Fed. R. Evid. 201(b); *Dahlgren v Muldrow,* 2007 WL 2827671, at *1 (N.D. Fla. Sept. 27, 2007).

first year of the Trump Presidency through scores of interviews with Administration officials.  President Trump declined to be interviewed.  Am.Compl. ¶35.

After Woodward announced he would write a follow-up to *Fear*, President Trump agreed to be interviewed because he "wish[ed] he met with [Woodward] for the last book." Ex. A, 47.  Woodward conducted his first presidential interview with President Trump on December 5, 2019 in the Oval Office.  *Id.* 45.  As Woodward explained:

> Our interviews took place during one of the most consequential years in American history.  Trump was impeached, the COVID-19 pandemic erupted, and the murder of George Floyd sparked the largest racial justice protests in the United States since the civil rights movement. I pressed Trump on these topics as well as foreign policy.

*Id.* 2.  At the December 5 interview, Woodward emphasized that "policy is what matters" for "the public, for history." *Id.* 49.  In subsequent Interviews, Woodward repeated 23 times his intention to memorialize President Trump's views on important subjects, in his own words, "for history." *Id.* 119; *see, e.g., id.* 139 ("But help me, for the history, Mr. President."); *id.* 275 ("But what I want to ask you—for the history …"); *passim.*

Each of the Interviews was "on the record"—anything that President Trump said could be attributed to him freely—and openly tape-recorded by Woodward. *Id.* 47, 137.  Woodward "tried to do [his] homework" before each interview and "asked questions directly." *Id.* 417.  As Woodward recognized, "Trump could take you on

a freeway to nowhere in an instant," *id.* 85, and Woodward often used his experience as an interviewer to steer the conversation to important matters of policy. *See, e.g.*, *id.* 49-50, 118.

Between December 5, 2019 and August 14, 2020, Woodward interviewed President Trump nineteen times while he was the sitting President. The first three Interviews were in person (two in the Oval Office, the third at Mar-a-Lago), and Woodward's tape recorder was visible throughout. *Id.* 45, 47, 86, 136-137. The remaining Interviews took place over the telephone, especially during COVID lockdowns. *See* Ex. A 175-294, 311-419. President Trump was apparently located in the White House for all of the calls, except one call he received on Air Force One. *Id.* 212-22. Woodward frequently reminded President Trump that the calls were being recorded noting, for example, that he was "turning [his] recorder on for our history." *Id.* 376; *see also id.* 361 ("BW: I've got—as I always do, I have my tape recorder on. TRUMP: That's okay. I don't mind."). At no point did President Trump object to being recorded, claim to own the Interviews, or state that Woodward was prohibited from using them after publishing his next book.

Government officials in the Trump Administration attended the Interviews and provided commentary. The December 5 interview included "Senator Lindsey Graham, Senior Political Counselor Kellyanne Conway, and two of Trump's aides, Deputy Press Secretary Hogan Gidley and Chief of Staff Mick Mulvaney," with

Vice President Pence joining towards the end. *Id.* 45, 78. Gidley also joined the December 30, 2019 interview at Mar-a-Lago, interjecting comments. *Id.* 136; Am.Compl. ¶50. Senior Advisor Jared Kushner and Deputy Chief of Staff for Communications Dan Scavino joined other Interviews. Ex. A, 86, 112, 169, 173, 221.

During the Interviews, President Trump made over a dozen statements admitting that he had no control over how or when Woodward would use the Interviews. Towards the end of the first interview, while seated with Woodward and Administration officials in the Oval Office, President Trump recognized Woodward would write what he wanted:

> AIDE: We've got about five minutes, gentlemen…
> TRUMP: Okay, well—I love this guy.
> CONWAY: He'll come back. Soon.
> TRUMP: Even though he writes shit about me. That's okay.

Ex. A, 76. Then, in the middle of the April 13, 2020 telephone interview, President Trump abruptly segued from Woodward's questions about COVID to ask (again) when he planned to publish his book:

> TRUMP: All right. What's your time, what's your timing?
> BW: My timing is I want to come out in September or October [2020]–
> TRUMP: Now think of it: if it's a bad book, you're right in front of my election. That's a beauty.

*Id*. 289.  During the June 22, 2020 interview, both President Trump and First Lady Melania Trump made statements demonstrating a lack of control over the Work's content and release date:

> TRUMP: And you know this man is one of the great legends of all time? He's doing a book on me. It'll probably be atrocious, but that's okay.
>
> MELANIA: When [is] it coming out?
>
> BW: It's coming out in September [2020].
>
> MELANIA: Okay.

*Id*. 359.  In the same vein, President Trump at one point observed that President Bush came "out terribly" from his interviews with Woodward.  *Id.* 285.  When Woodward responded that President Bush "had his say [and] didn't object," President Trump sighed:  "Ugh.  And in the end you'll probably write a lousy book."  *Id.*  Indeed, President Trump acknowledged that he could not tell Woodward what to write and could only "hope" that he "write[s his] answer[s]" fairly.  *Id.* 55; *see also id.* 323-24 ("TRUMP:  You're probably going to screw me."); 377 ("TRUMP: All I ask for is fairness.  And, you know, I'm sure I won't get it, but that's okay.").

The *only* restriction placed on the Interviews was Woodward's acknowledgement that they would not be used in contemporaneous news articles.  Accordingly, Woodward told President Trump, repeatedly, that "this [interview] is for next year, for the book."  Ex. A 84, 237, 289-90.  This was the understanding expressly stated in the third interview.  There, Woodward repeated

that the Interviews were for "the book to come out before the election." *Id.* 237, 289-90.  President Trump agreed that they were "[f]or the book only" and Deputy Press Secretary Gidley clarified that this meant "[n]o stories coming out, no nothing" prior to the book's proposed publication in the fall of 2020. *Id.* 137; Am.Compl. ¶50.

These Interviews became the core of *Rage,* Woodward's follow-up book to *Fear* published by S&S on September 15, 2020.[2] Am.Compl. ¶36.  President Trump continued to speak to Woodward after *Rage* was substantially complete—three Interviews occurred after Woodward had submitted initial manuscripts and a fourth after "the book was done." Ex. A, 338, 376, 389, 408.  Approximately "20 percent of" *Rage* derived from the Trump Interviews, *id.* 411, and Woodward published 38 audio clips from the Interviews when *Rage* was published.  *See* Am.Compl. ¶40. Woodward provided these excerpts to various news organizations, including *The Washington Post,*[3] which played them on air and online.  The Amended Complaint asserts no claim arising out of Woodward's prior release of the recordings in conjunction with the publication of *Rage*.

---

[2] The Amended Complaint claims that *Rage* was a "total failure," *see* Am.Compl. ¶39, but it debuted at No. 1 on *The New York Times* non-fiction best-seller list.  *See* Best Sellers – Books, *The New York Times* (Oct. 4, 2020), https://www.nytimes.com/books/best-sellers/2020/10/04/.

[3] *See* R. Costa & P. Rucker, *Woodward Book*, WAPO (Sept. 9, 2020), *available at* https://www.washingtonpost.com/politics/bob-woodward-rage-book-trump/2020/09/09/0368fe3c-efd2-11ea-b4bc-3a2098fc73d4_story.html.

## B.       Woodward Creates the Work Using His Raw Interviews and Extensive Supplemental Material

Woodward relistened to the Interviews in early 2022 and "decided to take the unusual step of releasing these recordings" because, as he says 23 times in the Work, the Interviews are a "historical record" of a critical year for our Nation.  Ex. A, 1-2.

"[F]or the most part the interviews [in the audiobook] proceed uninterrupted, fulfilling Woodward's goal of presenting Trump's voice and words for the historical record, and offering listeners the chance to hear and judge and make their own assessments."  Ex. A, 2.  Woodward also interspersed the Interviews with copious original content.  The Work contains an Introduction and Epilogue, which place the Interviews—and the Trump Administration—into a broader historical and political context.  For instance, the Epilogue sums up President Trump with the credo, "Everything is mine."  *Id.* 419.  Woodward drew this conclusion from an interview where President Trump took credit for a speech that his aides wrote because "[t]he ideas are mine … Everything is mine."  *Id.* 331, 414.

The Work also includes "227 new commentaries" written by Woodward and interwoven into the Interviews in order "to provide essential context or clarification."  *Id.* vii, 2.  Each interview opens with Woodward setting the scene— for example,  the first interview started "[a] few hours after Pelosi's press conference [announcing President Trump's first impeachment]."  *Id.* 45.   The Work also

provides factual background.  *See, e.g.*, *id*. 181 (offering context about President Erdogan).

The commentaries also frequently "break frame from the interviews," *id*. 2, to point out when President Trump said something inaccurate or misleading.  For instance, President Trump claimed that he "banned people coming in from China [at the outset of the pandemic].  Fauci was against it.  So was everyone else…." *Id*. 287.  Immediately after this statement, Woodward's "commentary" states:  "Again, this is not true at all…" *Id*.; *see also id*. 113-14, 356 (clarifying that "[t]he Mueller report cited ten instances of possible obstruction of justice").  Elsewhere, Woodward contrasts President Trump's words with his previous statements or statements from other government officials.  *See, e.g.*, *id*. 260; 405-07.

Woodward devotes an entire chapter of the Work to "one of the most important interviews for…*Rage*," which "wasn't with Trump" but "with National Security Adviser Robert O'Brien and Deputy National Security Advisor Matthew Pottinger." *Id*. 295.  Those interviews revealed that O'Brien and Pottinger gave a "stark, dramatic warning" early in the pandemic about the dangers of the coronavirus.  Woodward then documents how President Trump largely ignored these warnings—at great cost to human life—by reviewing inculpatory statements President Trump made in the Interviews and elsewhere. *Id*. 295-310.

On a technical level, Woodward oversaw the editing of raw interview tapes to remove "excessive repetition, irrelevant material, background noise and unintelligible audio." *Id.* 2; Am.Compl. ¶¶40, 59.  S&S engaged an audio producer to record Woodward's commentaries and splice them into the interview tapes and ensure "sound production quality." *Id.* vii, 137.  President Trump does not claim to have contributed to the audio-editing process, or any of the other work Woodward performed to transform the Interviews into the Work.

S&S published the Work as an audiobook on October 25, 2022. Am.Compl. ¶40.  A few months later, S&S published print editions, which transcribe the audiobook content. *Id.* ¶46.

## C.    The Amended Complaint

The Amended Complaint alleges that Woodward's publication of the Interviews and Work infringed President Trump's exclusive "copyright interests." Am.Compl. ¶¶65-72.  The Amended Complaint demands "a declaratory judgment that [President Trump] owns [the Work and the Interviews] in full and therefore is entitled to" recover "at least $49,980,000, exclusive of punitive damages." *Id.* ¶72(d).  In the alternative, President Trump requests a judgment that he "owns the copyright in his responses" to Woodward's Interview questions and is "therefore entitled to…pro rata revenues...." *Id.* ¶71.  The Amended Complaint also includes

interrelated State Law Claims and seeks millions of dollars in damages for these as well. *Id.* ¶¶81-136.

## ARGUMENT

For the reasons set forth below, the Amended Complaint should be dismissed for failure to state a valid cause of action.

## I.   THE COPYRIGHT CLAIMS FAIL BECAUSE PRESIDENT TRUMP LACKS A VALID COPYRIGHT REGISTRATION

President Trump's Copyright Claims (Counts I-II) fail because he does not allege that he obtained the required copyright registration prior to instituting suit. As the Supreme Court has reiterated, plaintiffs "must comply with [17 U.S.C.] §411(a)'s requirement that 'registration … has been made'" before filing suit. *Fourth Estate Pub. Ben. Corp. v. Wall-Street.com,* 139 S. Ct. 881, 887 (2019). "[A]lthough an owner's rights exist apart from registration,…registration is akin to an administrative exhaustion requirement that the owner must satisfy before suing to enforce ownership rights." *Id.* A plaintiff must "receive the Copyright Office's decision on [an] application before instituting suit." *Id. at* 891.

Whether President Trump frames his copyright claims as an infringement action or as "Declaratory Relief Regarding Ownership of Copyrights" and "Accounting" under "the Copyright Laws of the United States," Am.Compl. ¶¶65-80, he must still obtain a registration. Although the Copyright Act refers to registration as a prerequisite to an infringement action, controlling precedent in this

Circuit establishes that registration is required before a declaratory-judgment plaintiff may sue to establish copyright ownership or recoup damages. *Stuart Weitzman, LLC v. Microcomputer Res.,* 542 F.3d 859, 862-63 (11th Cir. 2008) (vacating order permitting declaratory judgment action to proceed without registration); *Dowbenko v. Google*, 582 F. App'x 801, 805 (11th Cir. 2014); *Hello I am Elliot, Inc. v. Sine*, 2020 WL 3619505, at *11 (S.D.N.Y. July 2, 2020) (same).[4]

## II.   PRESIDENT TRUMP DOES NOT OWN A COPYRIGHT IN WOODWARD'S INTERVIEWS OR WORK

Even apart from the copyright registration requirement, President Trump's Copyright Claims fail on the merits because (A) Woodward is the true author of the Interviews—and the Work—and thus their original owner, and (B) President Trump's contributions, taken alone, are government works that reside in the public domain.

### A.   Woodward Is the Copyright Owner, Not President Trump

As the true author of the Interviews, Woodward is the exclusive owner of the copyright interests in the Interviews and Work.[5]  President Trump disclaims joint

---

[4] Following the Supreme Court's clarification that the "registration requirement is a precondition to filing a claim that does not restrict a federal court's subject-matter jurisdiction," *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010), the Eleventh Circuit refashioned the *Weitzman* holding so that "a complaint claiming infringement of an unregistered copyright can be dismissed for failure to state a claim." *Fastcase, v. Lawriter,* 907 F.3d 1335, 1341 (11th Cir. 2018).

[5] S&S owns a copyright in the sound recording for the Work as a result of its work producing the Audiotape and agreements between it and Woodward.  However,

authorship.  Am.Compl. ¶¶47, 53.[6]  He asserts instead that he "owns [the Work and Interviews] in full" or, alternatively, "owns the copyright in his [interview] responses" (as opposed to Woodward's questions).  *Id*. ¶¶70-71.  Both arguments fail.

Copyright ownership "vests initially in the author or authors of the work." 17 U.S.C. §201(a).  The "general rule" recognized by the Supreme Court dictates that "the author is the party who *actually creates the work*, that is, the person who *translates an idea* into a *fixed, tangible expression* entitled to copyright protection." *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989) (emphasis added) (citing 17 U.S.C. §102); *see also Garcia v. Google,* 786 F.3d 733, 743-44 (9th Cir. 2014) (en banc) (actress had no copyrightable interest in film since she was not the one who "fixed [her] acting performance in [a] tangible medium").

Few courts have had the opportunity to apply these general principles to determine who owns interviews—perhaps because it is so obvious that ownership vests in the journalist, particularly when interviewing government officials—but several courts have held journalists own their interviews outright.  *See, e.g.*, *Taggart*

---

given that the current motion is only focused on President Trump's claims springing from his participation in the Interviews, this brief will only focus on the ownership issues as between Trump and Woodward.

[6] A "joint work" is "prepared by two or more authors with the intention that their contributions be merged into inseparable…parts of a unitary whole."  17 U.S.C. §101.

*v. WMAQ Channel 5 Chicago*, 2000 WL 1923322, at *3-5 (S.D. Ill. Oct. 30, 2000) (journalist owned jailhouse interview because, *inter alia*, prisoner had not fixed his oral expression in any tangible medium of expression); *Current Audio v. RCA*, 71 Misc. 2d 831, 834-35 (Sup. Ct. N.Y. Cnty. 1972) (holding Elvis Presley had no "property right" in press conference responses "which supersedes the right of its free dissemination"). The Eleventh Circuit has indicated that news organizations most likely hold the copyright in interviews with government officials because they "make [the] audio, filming and editing choices in the presentation of [the] material." *Pac. and South. Co., v. Duncan*, 792 F.2d 1013, 1014 n.1 (11th Cir. 1986). Vesting full ownership in the reporter is critical to fostering the "free dissemination of thoughts [and] ideas [on] newsworthy events and matters of public interest." *Current Audio*, 71 Misc. 2d at 834-35.

Woodward's ownership of the Interviews (and the Work as a whole) is buttressed by analogous decisions involving other types of works that involve creative input from multiple contributors, such as movies, which also "define[] the author as the person to whom the work owes its origin and who superintended the whole work, the 'master mind.'" *Aalmuhammed v. Lee*, 202 F.3d 1227, 1233 (9th Cir. 2000). The Second Circuit similarly held that when, as here, "multiple individuals lay claim to the copyright in a single, [non-joint] work, the dispositive inquiry" as to ownership "is which of the putative authors is the 'dominant author.'"

*16 Casa Duse v. Merkin*, 791 F.3d 247, 260 (2d Cir. 2015) (rejecting film director's claim to own raw footage he shot because producer was the "dominant author" of the project).  These same concepts apply equally to journalists' interviews.  *See* M.C. Amerine, *Wrestling Over Republication Rights:  Who Owns the Copyright of Interview?*, 21 MARQ. INTELL. PROP. L. REV. 159 at 181-84 (2017) (arguing that copyright rests with journalists who "mastermind," "shape," and "control" the interview by "performing the initial research, devising a theme, tailoring questions, to developing a rapport").[7]

Here, Woodward was the "dominant author" of the Interviews.  It was Woodward, not President Trump, who initiated the project, *see* Am.Compl. ¶36, and exercised the "decision making authority" that is a critical hallmark of copyright ownership.  *16 Casa Duse*, 791 F.3d at 260.  It was Woodward who "actually creat[ed]" the Interviews by taping them, thus "translat[ing] an idea into a fixed, tangible expression."  *Reid*, 490 U.S. at 737.  And it was Woodward who "superintended" or "masterminded" the Interviews by deciding what topics to cover,

---

[7] The decisions reaching a contrary result are generally based on outdated rationales or defunct doctrines.  Several were decided under common law copyright principles superseded by Section 102 of the 1976 Copyright Act.  *See, e.g., Estate of Hemingway v. Random House,* 23 N.Y.2d 341 (N.Y. 1968).  Others were decided before *Reid*, 490 U.S. at 737, and relied on now-improper understandings of Section 102's definition of authorship.  Some arose in different factual settings involving private citizens, not government officials, and contain limited reasoning.  *See, e.g., Suid v. Newsweek*, 503 F. Supp. 146 (D.D.C. 1980).

what questions to ask, when to press President Trump, or when to let him keep talking, all while steering President Trump back to matters of policy whenever he strayed. *See, e.g.*, Ex. A, 118; *supra*, 5-6.  President Trump's multiple on-the-record admissions that he did not control how the Interviews would be used further underscore Woodward's ownership. *See, e.g.*, Ex. A, 323-24; *supra*, 7-9; *see also Garcia*, 786 F.3d at 744 (where participant had no control over how the work was presented she could "hardly argue that the [Interviews were] fixed 'by or under her authority'").

Even more untenable is President Trump's remarkable claim that he owns the Work "in full."  Am.Compl. ¶70.  This argument ignores Woodward's editorial role and authorship of *all* the original content that transformed the raw Interviews into a coherent "historical record," including the original Introduction, Epilogue, and "227 commentaries."   Woodward also incorporated the voices of executive branch officials other than President Trump, including a whole chapter devoted to two Trump Administration officials. *See* Ex. A, 295-310; *see also* Dkt. 27-2 (appendix summarizing federal employees present during the Interviews, hereafter the "Appendix").  And Woodward, together with S&S audiobook editors and sound engineers, edited the raw Interviews for clarity, repetition, and sound quality. Because Woodward is the true and dominant author of his Work derived from his on-the-record Interviews of a sitting president, copyright law and public policy

dictate that Woodward is the author and original copyright owner—not President

Trump. *See 16 Casa Duse*, 791 F.3d at 256-59.

> **B.    President Trump Cannot Own His Interview Responses Because They Are Government Works under Copyright Law**

The Copyright Claims independently fail under the "Government Works"

doctrine because a sitting President cannot claim ownership over press interviews

provided by him as part of his official duties—and the Interviews fall squarely within

that doctrine.  The Copyright Act states that "copyright protection…is not available

for any work of the United States Government," which is defined as any "work

prepared by [1] an officer or employee of the United States Government [2] as part

of that person's official duties" ("Government Works" or "Government Works

doctrine").  17 U.S.C. §§101, 105.  "The basic premise of [S]ection 105…[is] that

works produced for the U.S. Government by its officers and employees should not

be subject to copyright" and fall "in the public domain."  H.R. Rep. No. 94-1476 at

58 (1976); *see also Georgia v. Public.Resource.Org*, 140 S. Ct. 1498, 1509-10

(2020) (discussing the Government Works doctrine).  In other words, the work

product of government representatives—including the President—is common

property that exists to benefit the public, not an opportunity for exclusive, private

gain.

In a transparent attempt to circumvent the Government Works doctrine, President Trump's Amended Complaint now alleges that the "Interviews were not conducted or performed in the scope of government employment."   Am.Compl. ¶38.[8]   But this is precisely the type of "threadbare" legal conclusion that, under established Supreme Court precedent, does not satisfy Federal Rule of Civil Procedure 8(a)(2) and categorically cannot help President Trump meet his burden of alleging plausible facts to support his claim.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   "Because the presumption of truth applies only to facts, the court may disregard 'labels and conclusions couched as factual allegations.'"   *Doe v. Samford Univ.*, 29 F.4th 675, 685 (11th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678); *see also ADA v. Cigna Corp*, 605 F.3d 1283, 1290 (11th Cir. 2010) ("[C]ourts considering motions to dismiss [should] eliminate any allegations in the complaint that are merely legal conclusions.").   Thus, this Court should  "disregard the portions of the complaint where [President Trump] allege[s] in a purely conclusory manner" that his ownership claim does not run afoul of the Government Works doctrine.   *Coral Ridge Ministries Media v. Amazon.com*, 6 F.4th 1247, 1252 (11th Cir. 2022).

Leaving aside his conclusory allegation, President Trump pleads no facts from which the Court could plausibly infer the Interviews were conducted outside the

---

[8] The Amended Complaint does not dispute—and thus tacitly admits—that President Trump was an "employee of the United States Government" for the purposes of satisfying the first prong of the Government Works test.

scope of his government employment.  Nor could he.  The relevant inquiry looks at the "nature and scope of [the government official's] duties," including "the use by him of government facilities and government personnel" in connection with the work at issue.  *Public Affairs Assocs. v. Rickover*, 369 U.S. 111, 113 (1962).  "In this context the duties of a high Government official should not be narrowly interpreted" and do not turn on a formal job description.  *Public Affairs Assocs. v. Rickover*, 268 F. Supp. 444, 448-49 (D.D.C. 1967).  Other key factors in a Government Works analysis include:  the subject matter of the contested work, whether the government employee prepared the work on his private time, and whether the work (such as a speech) was delivered after working hours or at gatherings of a private organization. *Id.* at 449-50.[9]  *See also Herbert v. U.S.*, 36 Fed. Cl. 299, 305-06 (Ct. Claims 1996) (holding under similar provisions of 28 U.S.C. §1498 that a work is prepared as part of the official functions of a government employee where it falls within his general job area, "even where he was not specifically required to perform the work at issue").[10]

---

[9] Although the *Rickover* cases were decided under Section 8 of the 1909 Copyright Act, the legislative history of the current 1976 Copyright Act makes clear that "the basic premise of [S]ection 105" of the 1976 Copyright Act is "the same as that of [S]ection 8" of the 1909 Act.  H.R. Rep. No. 94-1476 at 58.

[10] For obvious reasons, memoirs written *after* a President leaves office are not written in the course of his duties and thus are outside the scope of Section 105.  *See Harper & Row v. Nation Enter.*, 471 U.S. 539, 557 n.6 (1985).

Here, all of the Interviews occurred when President Trump was in office and related to his conduct as President.  Am.Compl. ¶37.  The first three Interviews took place in the Oval Office, the innermost seat of executive power, and Mar-a-Lago, the "Winter White House."   The remaining phone Interviews occurred while President Trump was on federal property, during which President Trump often made clear that he was "on duty."  *See, e.g.,* Ex. A, 256 ("TRUMP: A little pressed [for time]. I've got about 12 generals downstairs waiting for me.").  The subject matter of the Interviews focused on the weightiest issues facing the Trump Administration and the American public—such as President Trump's impeachment, his handling of COVID-19, and foreign relations with North Korea and China.  *See, e.g.*, *id.*, 50-51, 132-34, 137-42, 259-272.  President Trump also provided Woodward with special access to government documents, such as his official correspondence with Kim Jong Un.  Ex. A, 423-54.  Further, executive branch staffers monitored and participated in the Interviews—including the Deputy Chief of Staff for Communications and Deputy Press Secretary, whose jobs are focused on the Administration's public messaging.  *See, e.g.*, Am.Compl. ¶50; Ex. A, 45, 169-73; *supra*, 6-7.  President Trump repeatedly told Woodward to follow up on certain subjects with other administration officials, like National Security Advisors O'Brien and Pottinger— who Woodward also interviewed.  *See, e.g.*, Ex. A, 121, 176, 191, 295-310.  These

undisputed facts conclusively demonstrate that President Trump was conducting official business when he was interviewed by Woodward.

The Court need not take Defendants' word for it.  President Trump himself has argued in court filings that the "President, who must 'be always in function,'…is authorized, indeed required, to carry out his or her duties no matter where he is or when."  Ex. C, 11.  He further stated that "more than any other public official, the President is expected to respond to questions from the media that affect his ability to maintain the trust of the American people and effectively carry out his official duties…. [S]peaking to the press and communicating with the public is clearly conduct 'of the kind [a President] is employed to perform.'"  Ex. D, 8, 19.[11]  Thus, even President Trump's own broad definition of the nature of his duties confirms that the Interviews were "part of [his] official duties."  Nowhere in the Amended Complaint does President Trump make a single factual allegation that would call this common-sense conclusion into question.  *See, e.g, Coral Ridge*, 6 F.4th at 1253

---

[11] President Trump made these statements in *Trump v. Carroll* where he argued that he was entitled to immunity under the Westfall Act under principles of *respondeat superior* (28 U.S.C. §2679 *et seq.*).  2023 WL 2920882 (D.C. Apr. 13, 2023). While "[t]he definition of 'official duties' contained in that line of cases ruling on the question of executive immunity from suit is not controlling [in cases regarding Government Works]" (*Public Affairs Assocs.*, 268 F. Supp. at 448 n.2), President Trump's admissions in the *Carroll* lawsuit remain highly relevant here.  Further, while the Westfall Act cases are not binding, several decisions notably hold that an officeholder's statements "in response to a reporter's inquiries" fall "within the scope of employment."  *See, e.g.*, *Council on Am. Islamic Rels. v. Ballenger*, 444 F.3d 659, 664-65 (D.C. Cir. 2006).

(affirming dismissal because "the complaint did not present any factual allegations that would allow us to infer" necessary elements of the claim); *Streeter v. City of Pensacola*, 2007 WL 4468705, at *6 (N.D. Fla. Dec. 18, 2007).

The underlying principle that Presidents cannot own and profit from materials created in the course of their official duties is underscored by the Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§2201-2209, which provides that, "[t]he United States shall reserve and retain complete ownership, possession and control of Presidential records." *Id.* § 2202.[12]  While copyright is a distinct legal concept from the ownership of physical materials, it is illustrative that Congress enacted the PRA in response to President Nixon's claim (ultimately upheld) of private ownership over his presidential papers.  President Nixon was the last President to enjoy this privilege because "[t]he passage of the PRA in 1978 changed the ownership of Presidential records, converting them from being the personal property of the President into the personal property of the United States." *United States v. Navarro*, 2023 WL 2424625, at *11 (D.D.C. Mar. 9, 2023).  Moreover, even pre-PRA decisions recognized the principle that presidents should not profit from their

---

[12] The PRA broadly defines Presidential records as including "any documentary materials…created or received by the President [or his staff]…in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory or other official or ceremonial duties of the President."  44 U.S.C. §§ 2201(2), 2202.  "Personal records" are defined very narrowly, such as "purely private" diaries not utilized for Government business.  *Id.* § 2201(3).

government service.  As one court underscored, "it was the intent of the framers of the Constitution to prevent the Office of the President from being a position of both power and profit" and a president's "claim of ownership" of government materials is "repugnant to the very nature of the Office of the President." *Nixon v. Sampson*, 389 F. Supp. 107, 133-137 (D.D.C. 1975), stayed by *Nixon v. Richey*, 513 F.2d 430 (D.C. Cir. 1975).  Both the current PRA and the Copyright Act reflect these bedrock tenets.

Finally, President Trump relies on the Copyright Office's Compendium of Practices in a misguided attempt to justify President Trump's claim of copyright ownership. It includes a default administrative rule permitting interviewers and interviewees to register separate copyrights in their respective questions and responses.  *See* Am.Compl. n.1.  The Compendium speaks to interviews generally. It does not address and clearly does not—and cannot—overrule Section 105's statutory prohibition on private ownership of Government Works.  Further, "the Compendium is a non-binding administrative manual," and courts are required to "follow it only to the extent it has the power to persuade."  *Public.Resource.Org*, 140 S. Ct. at 1510.  Here, the argument for "splinter[ing]" a journalist's interviews of a sitting President or other government actors into a "Swiss cheese of copyrights" is unpersuasive. *Garcia*, 786 F.3d at 742.  Moreover, practical realities counsel strongly against this approach.  Copyright ownership comes with control over

25

content, and would grant government officials the ability to withhold or censor public information as a precondition for access. Any decision granting President Trump private ownership of his statements to the press as President would contradict the long tradition of opening up a President's words to public scrutiny.

In sum, President Trump's contributions to the Interviews are Government Works that the Copyright Act prevents him from owning in a personal capacity, thus barring his claims regarding the Interviews and, by extension, the Work. Dismissal is warranted for this independent reason.

## III.   THE PUBLICATION OF THE WORK WAS FAIR USE

Even assuming President Trump owns a copyright in the Interviews, the Copyright Claims should still be dismissed because Woodward's incorporation of that material into the Work is a fair use. The Copyright Act provides that "the fair use of a copyrighted work" for "purposes such as criticism, comment [or] news reporting…is not an infringement of copyright." 17 U.S.C. § 107.

Woodward's use of the Interviews is classic news reporting, using President Trump's actual words and tone as the foundation for the Work's extensive comments. In a leading decision, the Second Circuit held that *Bloomberg*'s unauthorized publication of an entire recorded earnings telephone call led by Swatch executives was fair use based on the rationale that, "in news reporting," the "need to convey information to the public accurately may in some instances make it desirable

and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Group Mgmt. Serv. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). "[A] speaker's demeanor, tone and cadence can often elucidate his or her true beliefs far beyond what a stale transcript or summary can show." *Id.*

If there were ever a case that called out for summary application of the *Swatch* principle, this is it. Woodward's use of the Interviews in the Work is a paradigmatic example of the "need to convey information to the public accurately." *Id*. As the Work states, Woodward "publish[ed] long excerpts" from the Interviews because he "wanted to put as much of [President] Trump's voice, his own words, out there for the historical record and so people could hear and judge and make their own assessment." Ex. A, 2. *See also* Ex. B, CD Back Cover ("[L]isteners will hear Trump as Woodward did: profane, incautious, divisive, and deceptive, but also engaging and entertaining…").

Section 107's four fair use factors strongly favor dismissal. The first factor looks to the purpose and character of the use. Adding extensive supplemental materials, the Work uses the Interviews for the transformative and presumptively fair purpose of "commenting" upon and "criticizing" statements Trump made during the Interviews and his Administration more broadly. *Andy Warhol Found. for Visual Arts v. Goldsmith*, -- S.Ct. --, 2023 WL 3511534, at *9-10 (U.S. May 18, 2023)

(noting that "criticism" and "news reporting" are "the sorts of copying that courts and Congress most commonly have found to be fair uses").

As for the second factor—the nature of the original work—a President's off-the-cuff, oral responses to an interviewer's questions have a "manifestly factual character" that deserves "thin" copyright protection at best. *Swatch*, 756 F.3d at 89.

As for the third factor—amount and substantiality of the use—the amount was commensurate with the Work's purpose to capture the "historical record" and allow the audience to experience President Trump in his own words. *Id.* at 90 ("[C]opying the entirety of a work is sometimes necessary for a fair use").

Finally, the fourth factor examines the effect on the potential market for the original and weighs strongly in favor of fair use. There is no traditional market or likely-to-be-developed market for Presidents to exploit press interviews conducted during their presidency, particularly when those discussions covered matters of state. *Am. Geophysical Union v. Texaco*, 60 F.3d 913, 930 (2d Cir. 1994). It would be perverse to recognize such a market, and contrary to public policy to enable public officials to profit from speaking to the press while in office. *See, e.g.*, *Google v. Oracle*, 141 S. Ct. 1183, 1206 (2021) (assessing "public benefits" as part of fourth factor analysis).

This is one of the rare cases where fair use is so evident from the face of the Amended Complaint that immediate dismissal is appropriate. *Mizioznikov v. Forte*,

2017 WL 5642383, at *3, 8 (S.D. Fla. Mar. 27, 2017) (granting Rule 12(b)(6) motion when fair use "defense appears on the face of the complaint") (quoting *Quiller v. Barclays Am./Credit*, 727 F.2d 1067, 1069 (11th Cir. 1984)).

## IV. THE STATE LAW CLAIMS ARE PREEMPTED BY THE COPYRIGHT ACT

The State Law Claims (Counts III-IX) should be dismissed because they are preempted by the Copyright Act under the doctrines of (A) "conflict preemption" and (B) "explicit preemption" under 17 U.S.C. §301. These two doctrines are independently applicable, and either one provides a basis for dismissal. *Foley v. Luster*, 249 F.3d 1281, 1285-89 (11th Cir. 2001).[13]

### A. The State Law Claims Are Barred by Conflict Preemption

Conflict preemption bars the State Law Claims because each requires this Court to enforce President Trump's alleged ownership interest in the Interviews in violation of the Copyright Act's clear directive that "[c]opyright protection…is not available for any work of the United States Government." 17 U.S.C. § 105(a).

---

[13] A third doctrine of preemption—known as "complete preemption"—is not applicable here. Under this doctrine, "if Congress has entirely displaced state law and replaced it with a federal cause of action, there's no such thing as a state-law claims falling within that cause of action." *Poet Theatricals Marine v. Celebrity Cruises*, 2023 U.S. App. LEXIS 11836, at *8-9 (11th Cir. May 15, 2023). The Eleventh Circuit has distinguished complete (or "field") preemption from conflict and express preemption. *Foley*, 249 F.3d at 1287-88.

Conflict preemption arises "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Foley*, 249 F.3d at 1287 (quoting *Pac. Gas & Elec. Co. v. State Energy Res. Conservation*, 461 U.S. 190, 204 (1983)).  "[W]hen an article is unprotected by a patent or a copyright, state law may not forbid others to copy that article."  *Compco v. Day-Brite Lighting*, 376 U.S. 234, 237 (1964).  To do so "would interfere with the federal policy, found in Art. I, § 8 of the Constitution and in the implementing federal statutes, of allowing free access to copy whatever the federal patent and copyright laws leave in the public domain."  *Id.*; *see also Goldstein v. California*, 412 U.S. 546, 559 (1973) (explaining that "[w]here the need for free and unrestricted distribution of a writing is thought to be required by the national interest,…a State [cannot] protect that which Congress intended to be free from restraint…"); *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141, 167 (1989) (preempting Florida law that "restrict[ed] the public's ability to exploit ideas that the patent system mandates shall be free for all to use"); *Vault Corp. v. Quaid Software*,  847 F.2d 255, 270 (5th Cir. 1988) (conflict preemption bars breach of contract claims that conflict with the Copyright Act).

Here, conflict preemption preempts the State Law Claims because they attempt to thwart Congress by permitting President Trump to "block off from the public something which federal law said belongs to the public." *Sears Roebuck &*

*Co v. Stiffel Co.*, 376 U.S. 225, 231-32 (1964).  Each State Law Claim asks this Court to contravene Section 105, whose express purpose is to ensure that "the individual Government official or employee who prepared the work could not secure copyright in it or restrain its dissemination by the Government or anyone else." H.R. Rep. No. 94-1476 at 59.  For example, President Trump's contract-based claims (the "Contract Claims") rest on the erroneous assumption that President Trump personally owns a copyright interest that he could then license to Woodward—precisely what Section 105 prohibits.  *See* Am.Compl. ¶¶108-112, 124-131.  The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") claim is also based on an ownership right that federal law prohibits.  It alleges that Defendants engaged in unfair practices through "Publication of the Interview[s]…*with knowledge of President Trump's rights to the ownership of the same*" and "to capitalize and benefit from President Trump's voice to the detriment of President Trump's ability to publish his own voice *given his position as author*." Am.Compl. ¶120.  And the Amended Complaint's remaining claims similarly rely on a theory that "unauthorized" publication of the Interviews constituted unjust enrichment because President Trump deserves to be "compensate[ed]" for the "benefit" of granting interviews to Woodward, again seeking a private benefit for public works.  *E.g.*, Am.Compl. ¶¶85, 88; *see id.* ¶¶81-89 (collectively with FDUTPA, the "Unfair Competition Claims").

No matter how President Trump labels his claims, their underlying foundation remains the same—claiming an exclusive, private right to control and be compensated for the dissemination of interviews with journalists he gave as part of his presidential duties. That is precisely what the Copyright Act forbids. In other words, contrary to the Supremacy Clause, the State Law Claims seek to eviscerate Section 105 by permitting public officials to convert government work product into private property at will. Since the President speaks for the People, his words belong to the People. The State Law Claims, by contrast, improperly seek to privatize the historical record and should be dismissed as preempted.

### B.   The State Law Claims Are Expressly Preempted by 17 U.S.C. § 301

While the Court need not go any further to dismiss the Amended Complaint in its entirety, the State Law Claims are independently barred by 17 U.S.C. § 301, which expressly preempts the application of any state laws that (1) fall within the "subject matter of copyright" and (2) are "equivalent to" the exclusive rights established in the Copyright Act. 17 U.S.C. § 301.[14] The first element is easily

---

[14] This Court should apply District of Columbia law to the State Law Claims in the few instances where there are material conflicts with Florida law. Since "[t]he Copyright Act provides no guidance regarding choice of law," courts employ common law choice of law principles and look to the jurisdiction "with the most significant relationship." *Dish Network v. TV Net Solutions,* 2014 WL 6685351, at *2-3 (M.D. Fla. Nov. 25, 2014). For the reasons stated in Defendant's venue motion, Washington, D.C. has the most significant relationship with the Work. Dkt. 27, 17.

satisfied because the State Law Claims arise out of the use of the Interviews in the Work, which falls squarely within copyright's subject matter.  *See* 17 U.S.C. §102(a)(1, 7).

As for the second element, the D.C. and Eleventh Circuits apply the "extra element" test:

> [I]f an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action, then the right does not lie within the general scope of copyright and there is no preemption.

*Foley,* 249 F.3d at 1285; *ICC Evaluation Serv. v. Int'l Ass'n of Plumbing & Mech. Offs.,* 2016 WL 11769565, at *5–8 (D.D.C. Sept. 19, 2016).  "A state law claim is not preempted if the extra element changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim."  *Foley*, 249 F.3d at 1285 (emphasis in original).  None of the State Law Claims meet this test.  As such, each is preempted.

### 1.    The Unfair Competition Claims Are Preempted by Section 301

President Trump's Unfair Competition Claims (Counts III-V) turn on his allegation that he "conferred a benefit" on Defendants by participating in the Interviews, which Defendants "accepted" and then improperly enriched themselves by publishing the Work "without accounting to and compensating President Trump…."  Am.Compl. ¶103.  Numerous courts have found such claims preempted

under Section 301 because "enrichment" is not an extra element. "While enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim." *Briarpatch Ltd. v. Phoenix Pictures*, 373 F.3d 296, 306-07 (2d Cir. 2004).[15] This conclusion is underscored since President Trump does not allege that there was an expectation and agreed terms of payment in the event that Woodward used the Interviews. Absent that foundation, the Unfair Competition Claims are nothing more than claims for damages arising from allegedly unauthorized copying. *See, e.g.*, *Psychic Readers Network v. Take-Two Interactive Software*, 2018 WL 1517690, at *3 (S.D. Fla. Feb. 5, 2018) (preemption where plaintiff alleged defendant used the "look and sound" of plaintiff's Miss Cleo character in defendant's video game "without paying"); *Ross v. Apple,* 2016 WL 8808769, at *5 (S.D. Fla. Dec. 30, 2016).[16]

President Trump's FDUTPA claim is also barred for lack of an extra element. The gist of the claim is that Defendants engaged in an unfair act by depriving

---

[15] *See also* 6 *Patry On Copyright* §18:51 (2023) ("[T]ypical unjust enrichment claims are preempted because they are mere attempts to state a claim for damages for unauthorized copying or other activity encompassed by Section 106"); *Pena-Rivera v. Ed. Am. S.A.*, 1997 WL 363975, at *2 (S.D. Fla. May 5, 1997).

[16] Florida courts are split over whether unjust enrichment claims are preempted. *Compare Psychic Readers Network*, 2018 WL 1517690 *with Jaggon v. Rebel Rock Ent.*, 2010 WL 3468101, at *3 (S.D. Fla. Sept. 1, 2010).

President Trump of his rights as a "consumer" by publishing a Work in contravention of his "rights to ownership" and "position as an author"—concepts parallel to his copyright claim. Am.Compl. ¶¶113-123. The Amended Complaint's "reiteration of the elements of an FDUTPA claim is not enough to save its…copyright infringement claims from preemption." *Millennium Travel & Promotions v. Classic Promotions & Premiums,* 2008 WL 2275555, at *3 (M.D. Fla. June 2, 2008). *See also Stripteaser. v. Strike Point Tackle,* 2014 WL 866396, at *5 (S.D. Fla. Mar. 5, 2014). Nor can President Trump evade preemption by offering as an extra-element conclusory allegations that Woodward harmed his reputation by editing the Interviews deceptively, Am.Compl. ¶120(iii), especially since the one example (*id.* ¶59) shows innocuous edits for clarity that fall far short of a valid false light claim. *See, Zimmerman v. Al Jazeera Am.*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017).[17]

## 2. The Contract Claims Are Preempted by Section 301

The Contract Claims (Counts VI, VIII-IX) are premised on the notion that Woodward unlawfully reproduced the Interviews in conflict with a supposed promise that they would only be used for the purposes of "writ[ing] a single book." Am.Compl. ¶47. While there is a Circuit split on whether Section 301 preempts

---

[17] "[A]ccounting claims based primarily on copyright infringement [also] do not satisfy the 'extra element' test and are preempted."). *Gary Friedrich Enter. v. Marvel Enter.,* 713 F. Supp. 2d 215, 233 (S.D.N.Y. 2010).

breach of contract claims, courts in several circuits including D.C. (the proper venue in this action whose law should apply) hold that a "promise" to "refrain" from "reproducing" or "distributing" a copyrighted work is not sufficient to constitute an extra element.[18] *ICC Evaluation Serv.*, 2016 WL 11769565, at *5–8 (citing *Wrench v. Taco Bell*, 256 F.3d 446, 455–58 (6th Cir. 2001) and *Am. Movie Classics v. Turner Entm't*, 922 F. Supp. 926, 931 (S.D.N.Y. 1996)); *1 Nimmer on Copyright* § 1.01[B][1][a] at 1–22 (1997) (although "the vast majority of contract claims will presumably survive scrutiny…nonetheless preemption should continue to strike down claims that, though denominated 'contract,' nonetheless complain directly about the reproduction of expressive materials").   President Trump's quasi-contractual claims of promissory estoppel and breach of the covenant of good faith and fair dealing should be preempted for essentially the same reason. *Cf. Briarpatch*, 373 F.3d at 306-07 (a "state law cause of action for…*quasi* contract should be regarded as an 'equivalent right' to copyright and hence, pre-empted").

## V.   THE STATE LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A VALID CAUSE OF ACTION

The State Law Claims should be dismissed for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*,

---

[18] The Eleventh Circuit holds that contract claims are generally not preempted by Section 301, while recognizing the views of other circuits. *Lipscher v. LRP Publ'ns*, 266 F.3d 1305, 1318-19 (11th Cir. 2001).

550 U.S. 554, 570 (2007).  Because President Trump has "not nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." *Id*.

### A.    The Contract Claims Are Meritless

President Trump's breach of contract claim against Woodward should be dismissed because he has failed to identify any clear enforceable promise that Woodward would not use the Interviews as part of the Work.  "The party asserting the existence of the oral contract has the burden of proving that an enforceable agreement exists."  *Strauss v. NewMarket Global Consult. Gp.,* 5 A.3d 1027, 1033 (D.C. 2010) (citing *Kramer Assocs. v. Ikam, Ltd,* 888 A.2d 247, 251 (D.C. 2005)).

The Amended Complaint alleges that "President Trump made Woodward aware on multiple occasions, both on and off the record, of the nature of the limited license to any recordings"—*i.e.*, that the Interviews were "for the sole purpose of accurately quoting President Trump for…*Rage*."  Am.Compl. ¶52.  President Trump cherry-picks two excerpts from the Work in which Woodward agreed that the Interviews would be "for the book."  *Id.* ¶¶50, 51.  But their context makes clear that the only relevant limitation that Woodward, a veteran *Washington Post* reporter, placed on himself was not to roll out a series of individual press "stories" based on his Interviews before publishing *Rage* in fall 2020.  *See, e.g.*, Ex. A, 137.

The Amended Complaint alleges no facts supporting a conclusion that Woodward ever agreed that President Trump owned the Interviews or that they would never be used for any purpose other than providing quotations for *Rage*. To the contrary, President Trump repeatedly indicated that he had no control over how Woodward would use the Interviews in Woodward's depiction of him. *See supra*, 7-8. And the Interviews continued after Woodward had submitted his manuscript for *Rage*, contradicting the notion that the Interviews were for the limited purpose of quotation in the book. *See supra*, 9. There is nothing approaching a plausible allegation that there was a meeting of the minds in which Woodward agreed that President Trump actually "owned" the Interviews and only granted Woodward a "limited license" to use quotes from the Interviews in *Rage*. Further, no experienced journalist would agree to such onerous terms—particularly with respect to materials that form part of "the historical record." *See, Montgomery v. Wells Fargo Bank*, 2017 WL 5127715, at *5 (N.D. Ala. Nov. 6, 2017) (contract claim dismissed where it was "implausible to construe [the alleged] series of events as an acceptance of a contract").

The statute of frauds provides an independent ground for dismissal. "[A]n action may not be brought…upon an agreement that is not to be performed within one year from the making thereof, unless the agreement [is in writing]." D.C. Code Ann. § 28-3502. President Trump's purported agreement with Woodward

prohibiting his reuse of the Interviews extended into perpetuity.  Thus, as a services contract that cannot be performed within one year, it is subject to the stringent writing and signature requirement.  *Myers v. Fabrics*, 101 A.D.2d 777, 778 (N.Y. App. Div. 1984), *aff'd in relevant part*, 65 N.Y.2d 75 (1985).  Here, since it is uncontested there is no signed "writing set[ting] forth the essential terms of the agreement," the breach of contract claims should be dismissed.  *Gharib v. Wolf*, 518 F. Supp. 2d 50, 54-55 (D.D.C. 2007).  *See also Sonders v. Roosevelt*, 64 N.Y.2d 869, 871 (N.Y. 1985) (tape recorded conversations did not satisfy Statute of Frauds); *Truman v. Brown*, 434 F. Supp. 3d 100, 114 (S.D.N.Y. 2020) ("motley communications" including "phone call transcripts…do not satisfy the Statute of Frauds").

As for President Trump's duplicative claims for promissory estoppel and breach of the covenant of good faith and fair dealing, they should be dismissed because they "merely…restate his breach of contract claim in other dress." *Kauffman v. Int'l. Bhd. of Teamsters*, 950 A.2d 44, 49 (D.C. 2008).

### B.  The Unfair Competition Claims Are Meritless

The Amended Complaint fails to state a claim under FDUPTA.  First, President Trump's FDUTPA claims should be dismissed because they arise from the publication of expressive speech.  The Eleventh Circuit has mandated that the publication of "editorial" content—*i.e.*, non-commercial speech—is categorically

exempt from FDUTPA liability. *Bongino v. Daily Beast*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020) (quoting Fla. Stat. §§ 501.203(8), 501.204(1) and dismissing FDUTPA claim based on news article).

Second, "FDUPTA applies only to actions that occurred within the state of Florida." *Five for Ent. v. Rodriguez*, 877 F. Supp. 2d 1321, 1330 (S.D. Fla. 2012).; *W.W. Sports Importadora Exportadora e Comercial Ltda v. BPI Sports*, 2016 WL 9375202, at *5 (S.D. Fla. Aug. 11, 2016). Clearly, the primary conduct at issue occurred in Washington, D.C.

Finally, President Trump does "not allege harm caused to consumers" and therefore "failed to state a claim for relief." *Garrett-Alfred v. Facebook*, 540 F. Supp. 3d 1129, 1141 (M.D. Fla. 2021). He cites boilerplate language about "mislead[ing] and deceiv[ing] other customers into viewing him in a poor light" to circumvent his failure to otherwise allege a harm to an actual consumer. Am.Compl. ¶120(iii). An unflattering opinion of President Trump cannot amount to consumer injury. *Hanson Hams v. HBH Franchise Co.* 2004 WL 5470401, at *8–9 (S.D. Fla. Dec. 21, 2004) (plaintiff must show "actual damages proximately caused by the unlawful conduct"). Even so, such injury is purely speculative, as he has alleged no actual consumer who has been injured.

President Trump's unjust enrichment claims should be dismissed as duplicative because they "seek[] recovery for the exact same wrongful conduct as in

[his] FDUTPA claim" and Contract Claims.  *Guerroro v. Target*, 889 F. Supp. 2d 1348, 1356-57 (S.D. Fla. 2012).  Moreover, there is nothing remotely "unjust" about Defendants' publication of the Interviews in the Work, which President Trump willingly participated in with knowledge that he did not control them.  *See* Ex. A, 292; *supra*, 7-8.  Further, the claim that "Woodward has failed to acknowledge or cite to President Trump's contributions to the [Work]" is flatly contradicted by the title, *The Trump Tapes.*

In short, the State Law Claims fail on their own merits in addition to being preempted.

## VI.    NO VOLITIONAL CONDUCT WAS PLEADED AGAINST PARAMOUNT

All claims against Paramount should be dismissed because the Amended Complaint includes no plausible allegation that Paramount was responsible for any of the allegedly unlawful conduct.  "It is a general principle of corporate law...that a parent corporation...is not liable for the acts of its subsidiaries."  *United States v. Bestfoods,* 524 U.S. 51, 61 (1998).  In the copyright context, this means that a parent corporation cannot be held liable for the infringement of its subsidiary "unless there is a 'substantial and continuing connection' between the infringing acts of the parent and subsidiary."  *Pegasus Imaging v. Northrop Grumman,* 2008 WL 5099691, at *2 (M.D. Fla. Nov. 25, 2008) (quoting *Howard Johnson v. Khimani,* 892 F.2d 1512, 1518 (11th Cir.1990)).

The only specific allegation of Paramount's involvement with the Work is that its "assets include [S&S]" and it "exerts direct control over the executive leadership" thereof. Am.Compl. ¶17. This is not nearly enough to establish liability against Paramount for its subsidiary's actions. *See Pegasus Imaging v. Northrup Grumman*, 2008 WL 2268323, at *1 (M.D. Fla. June 2, 2008) (dismissing copyright claim because "a parent corporation…is not liable for the acts of its subsidiaries"). The claims of unjust enrichment and violation of the FDUTPA against Paramount fail for substantially the same reason. *Extraordinary Title Servs v. Fla. Power & Light*, 1 So. 3d 400, 404 (Fla. DCA 3rd 2009).

## CONCLUSION

Defendants respectfully request that this Court dismiss the Amended Complaint with prejudice and award such other relief it deems just and proper.

Dated:  May 19, 2023

**DAVIS WRIGHT TREMAINE LLP**

*/s/ Elizabeth A. McNamara*

Elizabeth A. McNamara (NYBN 1930643)
Linda J. Steinman (NYBN 2137305)
John M. Browning (NYBN 5213038)
Leena M. Charlton (NYBN 5622147)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
          lindasteinman@dwt.com
          jackbrowning@dwt.com
          leenacharlton@dwt.com

**GUNSTER, YOAKLEY & STEWART, P.A.**

Kenneth B. Bell (FBN 347035)
Lauren V. Purdy (FBN 93943)
Derek K. Mountford (FBN127172)
One Independent Dr., Suite 2300
Jacksonville, FL 32202
Phone: (904) 354-1980
Email: kbell@gunster.com
          lpurdy@gunster.com

*Attorneys for Robert Woodward,
Simon & Schuster, Inc. and
Paramount Global*

**WILLIAMS & CONNOLLY\***

Kevin T. Bane (DCBN 438394;
*pro hac vice pending)*
Thomas G. Hentoff (DCBN 128600)

680 Maine Avenue SW
Washington, DC 20024
Phone: (202) 434-5804

Email: kbaine@wc.com
        thentoff@wc.com

*Of counsel to Robert Woodward*

## CERTIFICATION OF WORD COUNT

I hereby certify that this Memorandum of Law in Support of Defendants Rule 12(b)(6) Motion to Dismiss complies with Rule 7.1(F) of the Local Rules for the Northern District of Florida and this Court's order granting permission to file an oversized document, not to exceed 10,000 words.  Dkt. 22.

According to the word-processing system used to prepare this Motion to Dismiss or, in the Alternative, to Transfer for Improper Venue, the total word count for all printed text exclusive of the material omitted under Rule 7.1 is 9,989 words.

 Dated: May 19, 2023                                    */s/ Elizabeth A. McNamara*
                                                             Elizabeth A. McNamara

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice

of electronic filing to all counsel of record.

*/s/ Elizabeth A. McNamara*
Attorney