# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA

3:23-cv-02333-RV-ZCB

PRESIDENT DONALD J. TRUMP, 45th President of the United States of America, in his individual capacity,

Plaintiff,

v.

SIMON & SCHUSTER, INC., a New York corporation, ROBERT WOODWARD p.k.a. BOB WOODWARD, an individual, and PARAMOUNT GLOBAL, a Delaware corporation, f/k/a Viacom Inc., successor by merger to CBS Corporation, a Pennsylvania corporation f/k/a Westinghouse Electric Corporation,

Defendants.

## PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

Plaintiff, President Donald J. Trump, 45th President of the United States of America, in his individual capacity ("Plaintiff" or "President Trump"), respectfully submits this response in opposition to the Motion to Dismiss Amended Complaint pursuant to Rule 12(b)(6) ("Motion") and the corresponding Memorandum of Law ("Defendant's Mem.") [D.E. 38, 38-1] filed by the Defendants, Simon & Schuster, Inc. ("SSI"); Robert Woodward ("Woodward"); and Paramount Global

("Defendants") in this matter, and requests that this Court deny the Motion in its entirety for the reasons set forth below. In further support of this response in opposition, the Plaintiff hereby incorporates the facts pled in its Amended Complaint and further submits the declaration of his attorney, Robert Garson ("Garson Declaration").[1]

---

[1] *See* Exhibit 1 filed in conjunction with Plaintiff's responses in opposition.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................... 3

TABLE OF AUTHORITIES ....................................................... 5

ARGUMENT................................................................................ 8

**I. The status of President Trump's copyright registration at commencement of this lawsuit does not mandate dismissal.....................................8**

A. Plaintiff is pending receipt of a copyright registration certificate. ................... 8

B. Amendment may be in order, but dismissal is not warranted........................... 9

**II. Woodward is not the original author and copyright owner of the totality of the Interviews and the Work. ...................................................13**

A. Plaintiff's argument is undermined by the Copyright Office's policies and findings.................................................................................................. 13

B. Defendants discount the importance of the Copyright Office and its Compendium. ...................................................................................... 14

**III. The statutory preclusion against copyright of government works does not apply here…..................................................................20**

A. Contrary to the Defendants' argument, the Interviews, Audiobook and the Derivative Works are not uncopyrightable government works…………………………………………………………………………………… 20

B. While the government works exclusion does not apply, the Presidential Records Act does, and confirms the copyrightability of the Interviews and the Work. .. 24

C. Defendants' use of the Interviews in the Audiobook and the Derivative Works militates against fair use.................................................................... 27

Factor 1: Purpose and Character of Use (Commercial Nature or Nonprofit Education?) ............................................................................... 28

Factor 2: Nature of Copyrighted Work ................................................ 32

Factor 3: Amount and Substantiality of the Portion Used in Relation to the Copyrighted work as a Whole........................................................ 33

Factor 4: Effect of Use upon Potential Market for or Value of Copyrighted Work.35

**IV. President Trump's claims against the Defendants are not subject to preemption. ....................................................................39**

A. President Trump's claims are not barred by preemption via the government works doctrine............................................................................... 39

B. President Trump's state claims are not barred by 17 U.S.C. § 301. .................. 41

**V. President Trump's state law claims are sufficient to state a cause of action. 43**

A. Breach of Contract................................................................... 43

(i) "For the book" ............................................................................ 43

(ii) Statute of Frauds and breach of contract........................................ 44

(ii) Claims for promissory estoppel and breach of covenant of good faith and fair dealing........................................................................................ 44

B. Unfair competition and FDUPTA ...................................................... 45

(i) Fallacy regarding non-commercial speech......................................45

(ii) Identification of actual consumer. ................................................ 46

(iii) Claim duplication. ...................................................................... 47

**VI. Claims against Paramount Global. ...............................................47**

**VII. Conclusion .............................................................................49**

CERTIFICATE OF SERVICE.................................................................. 50

CERTIFICATION OF WORD COUNT.......................................................51

**TABLE OF AUTHORITIES**

## Cases

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023). ........................................................................................................... 30

*Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F.Supp.2d 537, 558 (S.D.N.Y. 2013) ................................................................................................34, 36

*Autoskill, Inc. v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1487 (10th Cir. 1993)...... 9

*Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103, 1109 (S.D.N.Y. 1994) ...................... 49

*Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020). ...... 32

*Butler v. Cont'l Airlines, Inc.*, 2001 U.S. Dist. LEXIS 20295, *3 (S.D. Tex. 2001) ..... 42

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994). ............ 34, 35, 36, 67

*Carnival Corp. v. Rolls-Royce PLC*, 2009 U.S. Dist. LEXIS 107261  (S.D. Fla 2009) .. 46

*Central Hudson Gas & Elec. Corp. v. Pub Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980) ................................................................................................................... 45

*Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992) ................. 41

*Dowbenko v. Google, Inc.* 582 F. App'x 801, 805 (11th Cir. 2014) ........................ 11

*Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.*,109 F. 3d 1394, 1402 (9th Cir. 1997) ................................................................................................32, 33

*Fastcase, Inc. v. Lawriter, LLC*, 907 F.3d 1335, 1341 (11th Cir. 2018).................... 10

*Foley v. Luster*, 249 F.3d 1281, 1285 (11th Cir. 2001).......................................... 41

*Found. for Lost Boys & Girls of Sudan, Inc. v. Alcon Entm't, LLC*, 2016 U.S. Dist. LEXIS 183684 (N.D. Ga. 2016). ....................................................................41, 42

*Garrett-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1142 (M.D. Fla. 2021)..... 47

*Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 659 (S.D.N.Y. 2017) .............................. 11

*Georgia v. Public. Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2020). ...............17, 28

*Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 723 F.2d 195 (2d Cir. 1983)... ..22, 28, 33, 34, 35, 36

*Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) ................................................................................................................. 36

*Infinity Broad Corp v. Kirkwood*, 150 F. 3d 104 (2d Cir. 1998). ............................ 34

*Iowa State Univ. Research Found. V. ABC*, 621 F.2d 57, 60 (2d Cir. 1980) .......30, 31

*Janik v. Mediapost Communications, Inc.*, 2017 U.S. Dist. LEXIS 98390 (S.D.N.Y. 2017) ................................................................................................................. 11

*Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 994 (2d Cir. 1980).... 11

*Meeropol v. Nizer*, 560 F.2d 1061 (2d Cir. 1977) ................................................. 22

*Membler.com LLC v. Barber*, 2013 U.S. Dist. LEXIS 135862  (E.D.N.Y. 2013) ......... 11

*Miller v. Anheuser-Busch, Inc.*, 2008 U.S. Dist. LEXIS 135270 (S.D. Fla. 2008) ....... 12

*Monge v. Maya Magazines, Inc.*, 688 F.3d 1164 (9th Cir. 2012) ...................... 30, 31

*Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 Fed. Appx. 873, 882 (11th Cir. 2015) .. 15

*Patchak v. Zinke*, 138 S. Ct. 897 (2018) .............................................................. 12

*PHA Lighting Design, Inc. v. Kosheluk*, 2010 U.S. Dist. LEXIS 30752 (N.D. Ga. 2010)
.......................................................................................................................... 42

*Pub. Affs. Assocs. v. Rickover*, 268 F. Supp. 444, 450 (D.D.C. 1967) ..................... 16

*Reed Elsevier, Inc. v. Muchnik*, 559 U.S. 154, 166 (2010) ...................................... 10

*Santos-Zacaria v. Garland*, 215 L. Ed. 2d 375 (2023) ........................................... 12

*Urban Textile, Inc. v. Rue 21, Inc.*, 2017 U.S. District. Lexis 49573 (C.D. Cal. 2017) 14

*Senter v. JP Morgan Chase Bank, N.A*, 810 F. Supp. 2d 1339, 1362 (S.D. Fla. 2011).
.......................................................................................................................... 45

*Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944) . 15, 16, 17

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) .......... 36

*Stuart Weitzman, LLC v. Microcomputer Res.*, 542 F.3d 859, 862-63 (11th Cir.
2008) ............................................................................................................. 9, 10

*Telebrands Corp v. Exceptional Prods*, 2011 US Dist. LEXIS 139308 (D.N.J. 2011).. 9,
10

*Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) ....................................... 45

*Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468 (6th Cir. 2015) ...... 14, 15, 16

*VHT, Inc. v. Zillow Grp.*, Inc., 461 F. Supp. 3d 1025 (9th Cir. 2019) ................... 12, 13

**Statutes**

17 U.S.C. § 410(c) .................................................................................................. 9

17 U.S.C. § 101 .................................................................................................... 21

17 U.S.C. § 105 .................................................................................................... 20

17 U.S.C. § 107(4) ............................................................................................... 35

17 U.S.C. § 411(a) ............................................................................................ 9, 10

45 U.S.C. §§ 2201-2207 ................................................................................... 25, 26

**Other Authorities**

Compendium of U.S. Copyright Offices Practices, Third Addition .......................... 14,
16, 17, 18, 23, 24, 38.

H.R. REP. NO. 94-1476, at 58 (1976) .................................................................. 23

Nimmer on Copyright ......................................................... 10, 13, 22, 32, 34, 35

Neuenschwander, John A.. A Guide to Oral History and the Law (Oxford Oral
History Series) Second Edition (2014) (p. 132). ................................................. 38

Sclafani, *Talking Donald Trump: A Sociolinguistic Study of Style, Metadiscourse, and Political Identity* ........................................................................................... 33

Patry on Copyright § 19:4 (2013) ......................................................................... 11

*Presidential Records Act: The President And Judicial Review Under The Records Acts.*, 60 Geo. Wash. L. Rev. 1477, 1483 (1992) ................................................ 25

Raymond J. Dowd, Copyright Litigation Handbook § 7:1 (2d ed. 2012) ............... 11

**ARGUMENT**

**I.   The status of President Trump's copyright registration at commencement of this lawsuit does not mandate dismissal.**

**A. Plaintiff is pending receipt of a copyright registration certificate.**

As detailed in the Garson Declaration filed in connection herewith, concomitantly with the filing of this action, President Trump applied for registration of the copyright to the Work[2]. Following communications with the Copyright Office, the Copyright Office expressed its willingness to grant copyright protection to President Trump as a joint author of the Work. *See id.* The Plaintiff is also aware that the Defendants have been in contact with the Copyright Office. *See id.* President Trump is now pending receipt of the copyright registration certificate reflecting President Trump's joint owner/author status. *See id.*[3]

"By presenting a registration certificate a party establishes the validity of the copyright prima facie and the burden to dispute the validity of the copyright

---

[2] Which presented unique difficulties as Defendants have refused to release to Plaintiff a copy of the original recordings. This has precluded Plaintiff's ability to register the work as a sole owner.  *See* Garson Declaration at ¶ 14.

"Work" is a term employed by the Defendants. Plaintiff interprets this term to include the Interviews a/k/a Interview Sound Recordings, Audiotape, and the Derivative Works, as referred to and defined in the Amended Complaint. *See generally* Am. Compl.; Defendant' Memorandum at p. 3.

[3] Plaintiff shall file a copy of the same and move to amend once permitted by the Court. *See* discussion regarding amendment, *infra.*

then shifts to the party challenging it." *Autoskill, Inc. v. Nat'l Educ. Support Sys.*, 994 F.2d 1476, 1487 (10ᵗʰ Cir. 1993); 17 U.S.C. § 410(c). Defendants' arguments, and the limited evidence presented by them (the only testimonial evidence before the Court is the Declaration of Bob Woodward,[4] without testimony from a single other person) cannot satisfy that burden.

**B.  Amendment may be in order, but dismissal is not warranted.**

Defendants call for dismissal because President Trump did not satisfy the copyright registration requirement referenced in 17 U.S.C. § 411(a) at inception of this lawsuit. But this does not warrant dismissal; if anything, it warrants amendment of the complaint to reflect satisfaction of the imminent registration element.

Defendants' dismissal argument is heavily premised upon *Stuart Weitzman, LLC v. Microcomputer Res.*, 542 F.3d 859, 862-63 (11th Cir. 2008); however, *Stuart Weitzman* is "out-of-date case law" and thus cannot be dispositive of the Motion. *See Telebrands Corp v. Exceptional Prods*, 2011 US Dist. LEXIS 139308 (D.N.J. 2011).

Under *Stuart Weitzman*, registration is required before a declaratory judgment plaintiff could sue to establish copyright ownership or recoup damages.

---

[4] This is referred to herein as the "Woodward Declaration." D.E. 37-1.

542 F.3d at 862-63. However, following *Stuart Weitzman*, the Supreme Court held that registration is not a jurisdictional prerequisite. *See Reed Elsevier, Inc. v. Muchnik*, 559 U.S. 154, 166 (2010) ("Section 411(a) thus imposes a type of precondition to suit that supports nonjurisdictional treatment under our precedents."); *see also Telebrands*, 2011 US Dist. Lexis 139308 at *8;  *Fastcase, Inc. v. Lawriter, LLC*, 907 F.3d 1335, 1341 (11th Cir. 2018) ("Although the registration requirement remains a "precondition to filing a claim," it "does not restrict a federal court's subject-matter jurisdiction."); *2 Nimmer on Copyright* § 7.16 (2023) (regarding the reasoning in *Stuart Weitzman* as "plainly wrong, given that the registration requirement set forth in the statute explicitly applies only to 'an action for infringement of the copyright,' not to a declaration of rights under the Copyright Act.").

Defendants' treatment of registration as a mandatory condition that categorically mandates dismissal if the condition is not met, *see* Defendants' Mem. at p. 14, is legally unsupported.  *Reed Elsevier* is generally illustrative on this point as the Supreme Court expressly "decline[d] to decide whether § 411(a)'s registration requirement is a mandatory precondition to suit that district courts may or should enforce *sua sponte* by dismissing copyright infringement claims involving unregistered works." *Reed Elsevier*, 559 U.S. at 155-56. Defendants rely

upon *Dowbenko v. Google, Inc.* 582 F. App'x 801, 805 (11th Cir. 2014) as support for their position of mandatory dismissal, but in *Dowbenko*, dismissal of a copyright infringement claim was deemed "appropriate," not that it was mandatory—a markedly different standard, with disparate facts.

The lack of copyright registration at the commencement of a lawsuit does not preclude later amendment of the complaint. *See* Patry on Copyright § 19:4 (2013) ("Where plaintiff has received registrations subsequent to the filing of the complaint, the complaint should be amended."); Raymond J. Dowd, Copyright Litigation Handbook § 7:1 (2d ed. 2012) ("[I]f a plaintiff registers copyrights after the filing of a complaint but does not supplement the complaint pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, the court may dismiss the case."). Therefore, the law envisages a case such as this where registration is pending. *See Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 659 (S.D.N.Y. 2017) (dismissing action without prejudice but granting plaintiff leave to amend complaint within sixty (60) days showing either a valid registration or a rejection of the registration application); *Membler.com LLC v. Barber*, 2013 U.S. Dist. LEXIS 135862 at *9 (E.D.N.Y. 2013) (dismissing copyright infringement claims based upon a lack of registration prior to filing a claim but allowing the party plaintiff to amend because the party obtain registered after filing the lawsuit); *Janik v. Mediapost*

*Communications, Inc.*, 2017 U.S. Dist. LEXIS 98390 at *8-9 (S.D.N.Y. 2017) (allowing plaintiff to amend complaint consistent with the opinion dismissing complaint for lack of copyright registration); *Miller v. Anheuser-Busch, Inc.*, 2008 U.S. Dist. LEXIS 135270, *5, n.3 (S.D. Fla. 2008) (noting that the copyright infringement suit is barred because plaintiff has failed to allege registration of works, but adding that "[s]ince Plaintiff may be able to cure this deficiency . . . [the] count should be dismissed without prejudice," although dismissing with prejudice due to "independent grounds for dismissal that cannot be remedied.") The courts, instead of elevating form over substance, sensibly build in the backstop of amendment, which could also transpire while any given motion is pending.

The Supreme Court recently confirmed its treatment as non-jurisdictional the threshold requirements that claimants must complete, or exhaust, before filing a lawsuit, because jurisdictional treatment could "undo the benefits of exhaustion, the purpose of which is supposed to be efficiency." *See Santos-Zacaria v. Garland*, 215 L. Ed. 2d 375 (2023); *Patchak v. Zinke*, 138 S. Ct. 897 (2018). *See also VHT, Inc. v. Zillow Grp.*, Inc., 461 F. Supp. 3d 1025, 1037 (9th Cir. 2019) (noting that "[c]ourts regularly create exceptions to non-jurisdictional

exhaustion requirements and other claim-processing requirements," and collecting cases).

In *VHT*, the court reject[ed] Zillow's arguments that the court "must" dismiss VHT's claims and "cannot excuse" a failure to comply, noting no purpose would be served by dismissal. *See VHT*, 461 F. Supp 3d at 1037; *See also* 2 Nimmer on Copyright § 7.16 (2023). Here, it is highly anticipated that by the time the Defendants' Rule 12(b)(6) motion is fully submitted, the Plaintiff will have in hand a copyright registration certificate reflecting his joint ownership of the Work. No purpose whatsoever would be served by dismissal of this action here and now, after months of pendency. Even if the Court is inclined to an enter an order of dismissal, the Plaintiff respectfully requests that the Court afford President Trump the opportunity to amend his complaint to reflect that the copyright registration element of his claims has been satisfied, as opposed to requiring him to launch a separate lawsuit on this issue.

**II.  Woodward is not the original author and copyright owner of the totality of the Interviews and the Work.**

**A.  Plaintiff's argument is undermined by the Copyright Office's policies and findings.**

13

Woodward's claim that he is the original and sole author and copyright owner of the Work is belied by the Copyright Office's entrenched policies and determination in this matter.

**B. Defendants discount the importance of the Copyright Office and its Compendium.**

The "Compendium of U.S. Copyright Offices Practices, Third Addition" ("Compendium") is more than just a secondary authority. *See Urban Textile, Inc. v. Rue 21, Inc.*, 2017 U.S. District. Lexis 49573 at *1, n1 (C.D. Cal. 2017). It "is an internal manual" published by The Copyright Office "that instructs its employees who are tasked with reviewing and registering copyrights how to **apply the relevant provisions of the Copyright Act uniformly**." *Varsity Brands, Inc. v. Star Athletica, LLC*, 799 F.3d 468, 480 (6th Cir. 2015) (citing the Compendium at §§ 903.1, 924-924.3(D) (emphasis added)). It

> is the administrative manual of the Register of Copyrights concerning Title 17 of the United States Code and Chapter 37 of the Code of Federal Regulations. It provides instruction to agency staff regarding their statutory duties and provides expert guidance to copyright applicants, practitioners, scholars, **the courts,** and members of the general public regarding institutional practices and related principles of law. *See* 37 C.F.R. § 201.2(B)(7).

(emphasis added). *See* Compendium at p. 1. Moreover it is an authority which "documents and explains the many technical requirements, regulations, and legal

interpretations of the U.S. Copyright Office with a primary focus on the registration of copyright claims, documentation of copyright ownership, and recordation of copyright documents, including assignments and licenses." *Id.* at p. 2.

Courts commonly defer to Copyright Office construction and guidance. *See, e.g.*, *Olem Shoe Corp. v. Wash. Shoe Corp.*, 591 Fed. Appx. 873, 882 (11th Cir. 2015) (the Copyright Office's construction of the meaning of "preexisting work" "merits deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944) as the copyright law is "highly detailed" and it is apparent that the Copyright Office "can bring the benefit of specialized experience to bear on the subtle questions in this case."). *Varsity Brands* highlights the deference:

> We now hold that the Copyright Office's determination that a design is protectable under the Copyright Act is entitled to *Skidmore* deference. Individual decisions about the copyrightability of works are not like "rules carrying the force of law," which command *Chevron* deference. *Mead*, 533 U.S. at 226-27. Like tariff-classification rulings, which the Supreme Court held are entitled to *Skidmore*—not *Chevron*—deference, *id.* at 235, copyright registration is not "a product of such formal process," *id.* at 235, or the type of process that suggests that the Copyright Office is engaging in any sort of rulemaking when issuing certificates of registration. And, although the Copyright Office is "charged with applying [the Copyright Act]," and therefore "necessarily make[s] all sorts of interpretive choices," *id.* at 227, these choices are akin to tariff-ruling letters because they apply to individual applications and are conclusive only as to the application under review, *see id.* at 233-

34. [****1782] Hence, we conclude that the [*480] Copyright Office's decision to issue a certificate of copyright registration is "beyond the *Chevron* pale." *Id.* at 234.

How much to defer to the determination to issue a copyright registration depends on "'the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking the power to control.'" *Mead*, 533 U.S. at 228 (quoting *Skidmore*, 323 U.S. at 140).

*Id.* at 479-480. In *Varsity Brands*, the Sixth Circuit Court of Appeals analyzed the foregoing factors via the "evidence in the record," and found that the court below had "erred by failing to give greater deference to the Copyright Office's registration determinations." *Id.* at 480. In so doing, the Court recognized that "the Copyright Office's expertise in identifying and thinking about the difference between art and function surpasses ours." *Id.  See Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 994 (2d Cir. 1980) ("The Copyright Office continually engages in the drawing of lines between that which may be and that which may not be copyrighted."). Indeed, the Copyright Office is not shy about the deference historically afforded to its Compendium:

The Compendium does not override any existing statute or regulation. The policies and practices set forth in the Compendium do not in themselves have the force and effect of law and are not binding upon the Register of Copyrights or Copyright Office staff. However, the Compendium does explain the legal rationale and determinations of the Copyright Office, where applicable, including

16

> circumstances where there is no controlling judicial authority. The Supreme Court recognized that courts may consider the interpretations set forth in administrative manuals, policy statements, and similar materials "to the extent that those interpretations have 'the power to persuade.'" *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (internal citations omitted); *Georgia v.* Public.Resource.Org, Inc., 140 S. Ct. 1498, 1510 (2020) (applying "power to persuade" standard to the Compendium). The weight of [the agency's] judgment . . . in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade . . . ." *Skidmore v. Swift* & Co., 323 U.S. 134, 140 (1944).

Compendium at p. 2 (itemizing various copyright cases in which courts have cited the Compendium).

Section 719 of the Compendium specifically covers the subject of interviews, defined as a "written or recorded account of a conversation between two or more individuals [whereby] typically, the interviewer poses a series of questions that elicit a response from the interviewee(s)." *See* Compendium at § 719, p. 33. Here, the Copyright Office confirms that an interview may be the object of copyright registration:

> An interview may be registered if the conversation has been fixed in a tangible medium of expression and if it contains a sufficient amount of creative expression in the form of questions and responses. Specifically, an interview may be registered as a literary work if it has been fixed in a written transcript, an audio recording, a video recording, or other medium of expression. An interview may be registered as a work of the performing arts if the interview was

> performed or is intended to be performed before an audience, such
> as a television interview, radio interview, or onstage interview.

*Id.* Here, the Interviews are most certainly fixed in a tangible medium of expression, as they were recorded. Moreover, the Interviews are replete with creative expression in the form of questions and certainly Plaintiff's responses, conceded by Woodward as being the catalyst for publication. *See* Garson Declaration (citing Woodward's various statements).

> As set forth in the Compendium,
>
> The U.S. Copyright Office will assume that the interviewer and the interviewee own the copyright in their respective questions and responses unless **(i) the work is claimed as a joint work, (ii) the applicant provides a transfer statement indicating that the interviewer or the interviewee transferred his or her rights to the copyright claimant, or (iii) the applicant indicates that the interview was created or commissioned as a work made for hire.** If the applicant fails to provide a transfer statement or fails to answer the work made for hire question, the registration specialist may communicate with the applicant if it appears that the interviewee or the interviewer is attempting to register the entire interview instead of registering a claim in his or her contribution to the work. For guidance on providing a transfer statement, see Chapter 600, Section 620. For guidance on answering the work made for hire question, see Chapter 600, Section 614. For guidance on joint works, see Chapter 500, Section 505.

*Id.* at § 719, p. 33 (emphasis added).

In this case, the Copyright Office concluded, in its specialized experience and investigation,[5] that subsection (i) applies, and has construed the work as a joint work, such that a corresponding copyright registration reflecting Plaintiff's copyright as joint author is imminent. Therefore, presumptively, President Trump has such rights as a matter of law, and it is undoubtedly the burden of Defendants to shoulder the burden in rebutting the presumption.  None of the materials filed by the Defendants in opposition to the Amended Complaint reflect Defendants' ability to satisfy that burden.

With this presumption in place as a matter of law, the argument that Woodward is the sole author and owner is legally tenuous but also disputed. Given the evidence of Woodward's agreement limiting his use of the Interviews, *see* Am. Compl. at ¶¶ 46-51, and his admission that the publication of an interview in this matter was completely new territory for him,[6] *see* Garson Declaration at ¶10, whether Woodward is the sole author/owner is a factual matter that may not be disposed of at this early stage of litigation, without further discovery. Because of factual questions that are still pending a response

---

[5] As stated previously, the Copyright Office was precluded from applying its regular presumptions of individual ownership of responses as, in order to do that, Plaintiff would have to submit an original recording of the responses. *See* Garson Declaration at ¶14.

[6] None of the defendants are relying upon an "advice of counsel" defense, as discussed counsel-to-counsel.

from the Defendants, it cannot be decided as a matter of law that Woodward, as opposed to President Trump, has full authorship and copyrights to the Interviews and the Work. In effect, even if this Court does not formally accept the Copyright Office's determination, that determination and other facts asserted in this case precludes a determination as a matter of law that President Trump has no copyright protection at all, while Woodward does. This Court may find just as the Copyright Office has, or it may declare, after discovery, that Woodward and Trump are both authors and copyright owners of the Interviews and the Work, that each are owners of their respective questions and responses or that President Trump is the sole owner, as President Trump seeks, in pertinent part, a declaration of his rights to the Interviews and the Work. The various perspectives in this litigation, not only that of Woodward and President Trump, but also the other defendants and the Copyright Office, reflect a factual conflict incapable of resolution at this early stage of litigation.

### III.   The statutory preclusion against copyright of government works does not apply here.

### A. Contrary to the Defendants' argument, the Interviews, Audiobook and the Derivative Works are not uncopyrightable government works.

17 U.S.C. § 105 of the Copyright Act provides:

Copyright protection under this title is not available for any work of the United States Government, but the United States Government is not precluded from receiving and holding copyrights transferred to it by assignment, bequest, or otherwise.

The Act defines "work of the United States government" as "a work prepared by an officer or employee of the United States government as part of that person's official duties." 17 U.S.C. § 101. The Defendants have had a tunnel vision approach to this provision from the outset. In their view, the exclusion automatically applies here based upon President Trump's service as president. That is an incorrect application of the government works doctrine.

As a starting point, for the government works exclusion to apply, the underlying works would not only have to be prepared by an officer or employee of the United States, but also be prepared as part of that person's official duties. 17 U.S.C. § 101. Defendants try to satisfy these two separate elements by repeatedly harping on President Trump's status as an officer or employee of the United States by way of his presidency; however, case law confirms that presidential status, or indeed governmental status, is not an automatic trigger for application of the government works doctrine. *See, e.g.*, *Pub. Affs. Assocs. V. Rickover*, 109 U.S. App. D.C. 128, 284 F.2d 262, 269 (D.C. Cir. 1960) ("It cannot be properly said . . . that a government official who speaks or writes of matters with

which he is concerned as an official is by the very fact of being such an official barred from copyright on his productions.'"); 1 Nimmer on Copyright § 5.13 (quoting H.Rep., p. 58 for the proposition that "'a Government official or employee would not be prevented from securing copyright in a work written at that person's own volition and outside his or her duties, even though the subject matter involves the Government work or professional field of the official or employee.'"); *Harper & Row, Publishers, Inc.* v. *Nation Enters.*, 723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985) (refusing to go so far as to find that the words Ford spoke when he was in office may not be copyrighted by him as works of the United States government, for the reason that "[t]he conversations originated with Ford, and unlike the testimony before the Hungate Committee, were neither fixed as writings nor publicly delivered as part of any person's official duties . . . the phrasing of the sentence itself may be copyrighted by that official if and when it is later written down.") To be sure, if presidential status was synonymous with uncopyrightable," the subject exclusion would be an express "presidential works" exclusion, and there would be no case law affording a president or other government figure the benefit of copyright protection. But there is no such narrowly-tailored exception, and such case law does exist. *See supra.*  Thus, one can be a presidential or other

government figure and still benefit from the protections of the Copyright Act. *See also* Compendium at section 313.6(c)(1), at p. 35 (citing H.R. REP. NO. 94-1476, at 58 (1976), reprinted in 1976 U.S.C.C.A.N. at 5671) (one of the Compendium-recognized exceptions to the government works exclusion is that "[a] work prepared by an officer or employee of the U.S. government may be registered if the work was prepared at that person's own volition and outside his or her official duties, even if the subject matter focuses on the author's work for the government.").

Even if President Trump was an officer or employee of the United States, the Defendants must still show that the Interviews were prepared in the course of his official duties. Defendants fail to establish this element. Short of saying who was present during the interviews, the Defendants offer no such evidence. Indeed, the evidenced adduced to date establishes that the Interviews were prepared at his own volition and outside of his official duties. *See* Garson Declaration at ¶ 21. The mere fact that President Trump was in office during the interviews is not tantamount to the interviews being in the course of official duties. Defendants go from "if" to "then" without consideration of the in-between and without consideration of the fact that being a President is both a temporal role and a duty, fulfilled at home, in an office (which are both in the

same building) and offsite; one can be a president and also play golf, be an equestrian, and also be a parent. Under these facts, and as a matter of case law, whether any works were prepared in the course of official duties entails a factual determination, and that cannot be made at this stage. *See Pub. Affs. Assocs. v. Rickover*, 268 F. Supp. 444, 450 (D.D.C. 1967) (holding that "the circumstances of the preparation and delivery of the speeches and the speeches themselves must be examined to determine whether the Admiral was acting in his public or his private capacity.").

If the Defendants wish to invoke the government works exclusion, they are tasked with sufficiently alleging with why it applies. President Trump is not required to plead it for them.  Finally, Defendants concede that the Compendium speaks to interviews generally, without distinction or difference. That generality is precisely why no distinction is required to be made between the Interviews and other interviews, the law applied with equanimity.

**B. While the government works exclusion does not apply, the Presidential Records Act does, and confirms the copyrightability of the Interviews and the Work.**

The Presidential Records Act ("PRA") shows why Defendants' government works argument is fraught with frailty. The government works preclusion cannot be dispositive of President Trump's rights with respect to the Work—in particular,

the Interviews—because these works are personal records, not presidential records, under the PRA. *See* 45 U.S.C. §§ 2201-2207 (1988).[7] The PRA was enacted to "prevent a repeat of Watergate's legal drama surrounding ownership of presidential records by asserting public ownership of such records and to ensure the preservation and public availability of presidential records by imposing certain specified procedures." *Presidential Records Act: The President And Judicial Review Under The Records Acts.*, 60 Geo. Wash. L. Rev. 1477, 1483 (1992) (citing *See* H.R. REP. NO. 1487, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5733). Defendants incorrectly argue that the point of the PRA is to prevent a "profit" situation; rather, the PRA contemplates the parameters and limitations of public access to a former President's records. To that end, it distinguishes between "Presidential records" and "personal records." 44 U.S.C.S. § 2201 (LexisNexis, Lexis Advance through Public Law 118-3, approved April 10, 2023).

Pursuant to the PRA, the United States "reserve[s] and retain[s] complete, ownership, possession, and control of *Presidential records*." 44 U.S.C.S § 2201(2) (emphasis added). There is no designated provision to *personal records*,

---

[7] There is no interplay, as a matter of law, between the PRA and the Copyright Act. There are two possible lines of reasoning: (i) the Copyright Act does not apply to the President at all. If it did then the entirety of the PRA would be otiose; or (ii) the PRA is a predicate for applicability to the CA, in that if the PRA bites on any given work, any government works doctrine would flow from that primary determination.

confirming the United States *does not* reserve or retain complete ownership, possession, and control of Presidential records.  At issue in this action are not Presidential records, but rather personal records in the nature of "diaries, journals, or other personal notes serving as the functional equivalent of a diary or journal which are not prepared or utilized for, or circulated or communicated in the course of, transacting Government business." 44 U.S.C.S. § 2201(3) (category of PRA-recognized personal records).

In this case, Woodward acting as author rather than journalist has made an approach to President Trump for his personal impressions on a range of topics for a biographical book, in the course of which, Woodward made the request that the interviews be recorded, as an aide memoire for that book and which President Trump made clear that any such recordings were for "the book." Woodward agreed to proceed on that basis, as alleged in the Amended Complaint and evident on the face of the recordings. *See* Am. Compl. at ¶¶49-50. The Interviews as memorialized by the Work were not conducted in the form of official press conferences, not prepared or utilized for, or circulated or communicated in the course of, transacting government business. Further, the SSI website concedes

that the Trump Tapes and Rage both fall under the category of Biography & Memoirs,[8] a functional equivalent of a diary or journal.

President Trump submits that the Work falls within the PRA, which, on one hand, functions independent of and as a functional exception to the Copyright Act and its government works provision, and on the other hand, informs the Copyright Act provision relating to copyrightability of government works.  It does so by first defining the nature of a presidential work that is subject to government ownership and providing that if the work is deemed a personal record, there can be no government ownership and thus no government copyright. The Defendants incorrectly have considered the PRA and the Copyright Act in their respective vacuums, without considering the impact of the PRA upon the government works doctrine. That failure defeats the instant motion.

### C. Defendants' use of the Interviews in the Audiobook and the Derivative Works militates against fair use.

As a preliminary matter, Defendants claim "it was a fair use to quote the President in the Work." *See* Introduction at p. 3. But as set forth herein, what the Defendants have done here transcends quoting.

---

[8] https://www.simonandschuster.com/search/books/Author-Bob-Woodward/Category-Biography-Autobiography/Available-For-Sale-Now/_/N-1z13w6gZhr0Zpgz/Ne-pgt

In determining whether a defendant's use of a copyrighted work constitutes fair use, courts look at four factors, discussed below. *See Harper & Row, Publrs. v. Nation Enters.*, 471 U.S. 539, 561 (1985) (noting that fair use, as codified in the Copyright Act, functions "as an affirmative defense requiring a case-by-case analysis). Further, because it is "designed to accommodate First Amendment Concerns, [it] is notoriously fact sensitive and often cannot be resolved without a trial." *Georgia v. Public. Resource.Org, Inc.*, 140 S. Ct. 1498, 1513 (2020).

Examination of these factors here confirms the Defendants have not, as a matter of law, met their burden to prove that their use is fair use.

**(a) Factor 1: Purpose and Character of Use (Commercial Nature or Nonprofit Education?)**

Central to Defendants' argument as to why the first factor favors the Defendants is the claim that the Work "add[ed] extensive supplemental materials." *See* Defendant's Mem. at p. 10. This is a self-serving statement which cannot be relied upon at the motion to dismiss stage because there is nothing before this Court to suggest the Defendants added anything of the sort. The Woodward Declaration is scant on detail; there is no testimony on this issue

whatsoever from the other defendants or from any other third-party that could shed light on the issues raised here. *See* Woodward Declaration at D.E. 37-1.

Defendants have not provided the raw, unedited recordings to which, according to the testimony of Woodward and no one else, purportedly added "extensive materials." *See* Defendant's Mem. at p. 10. Defendants have produced a copy of the Work as published but have failed to present to the court the *original* recordings and interviews between President Trump and Woodward.[9] That impedes the court's ability to engage in the juxtaposition and reconciliation that is part and parcel of the fair use inquiry. Informing this Court that the Defendants added something to the work to which President Trump asserts a copyright interest is meaningless without presenting a version of the "before and after." Having failed to do so, the Plaintiff has not shown, as a matter of fact or law, that it somehow transformed the original work. The allegation of transformation is, in fact, highly specious based upon Woodward's characterization own statement about the Work.[10]  *See* Garson Declaration at ¶ 9. The question is, and the Defendants have failed to answer, what the Defendants

---

[9] Arguendo, Woodward's own admissions of the main selling point of the Work, hearing the words of President Trump, minimizes the value of the alleged materials and further many of the "commentaries" lend little to the value of the Work, which is a fact intensive question to the defense of fair use. *See* Garson Declaration quoting Woodward.

[10] https://www.bobwoodward.com/books/trump-tapes

have done with the Interview Sound Recordings. Plaintiff respectfully submits that this Court cannot take the Defendants' assertion of transformation for granted[11]. Defendants have offered nothing to substantiate their claim of transformation, and the Defendants' own disclaimers to the Work highlight the lack of transformation. Defendants' references to "at times break[ing] frame" but also to the addition of "extensive supplemental materials," and an overall inability to get their story straight, necessitates discovery proceedings. *Compare* Garson Declaration at ¶ 9 *with* Defendant's Mem. at p. 10.

Defendants claim the Work qualifies as fair use because criticism and news reporting constitute fair use. But "[a]lthough news reporting is an example of fair use, it is not sufficient itself to sustain a *per se* finding of fair use." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012) ("fair use has bounds even in news reporting, and no per se "public interest exception exists"). The umbrella of news reporting is not a default fair use refuge from infringement. *See id.* at 1173. Put another way, "[w]aving the news reporting flag is not a get out of jail card in the copyright arena." *Id.* (citation omitted). *See also Iowa State Univ. Research Found. V. ABC*, 621 F.2d 57, 60 (2d Cir. 1980) (noting that resolution of a fair use

---

[11] Especially given the recent case law on what constitutes transformative, which erodes Defendants' contentions. See *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258 (2023).

claim "depends on an examination of the facts in each case (and) cannot be determined by resort to any arbitrary rules or fixed criteria," and citing to *Meeropol v. Nizer,* 560 F.2d 1061, 1068 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 [**8]  S. Ct. 727, 54 L. Ed. 2d 756 (1978)).

Even if there was an element of newsworthiness, "newsworthiness itself does not lead to transformation." *Monge*, 688 F. 3d at 1176.  "Wholesale copying sprinkled with written commentary . . . [is] at best minimally transformative.  *Id.* Plaintiff submits that the Work is, at best, wholesale copying sprinkled with written commentary–which is at best minimally transformative. *Id.*

Notably, the Defendants never address the commercial use and educational/non-profit dichotomy and have waived this argument. In any event, President Trump submits the Work is emblematic of commercial use. The Audiobook and the Derivative Works have been sold for a profit to the Defendants. Despite claiming that this is somehow other than commercial use by invoking use of the "historical record" (a self-serving, contrived defense unknown to law), the Defendants have all profited from sales, as reflected in sales data produced by the Defendants. "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa*, F. 2d at

31

61. While seeking profit does not by itself preclude application of the fair use defense, whether a copyrighted work was used, at least in part, for commercial exploitation," must be taken account. *Id.* Woodwards' own writings confirm he perceived publication of President Trump's quotations as a money-maker. *See* Garson Declaration at ¶¶ 9, 10, 12.  This factor thus weighs heavily in favor of Plaintiff.

**(b) Factor 2: Nature of Copyrighted Work**

The third factor looks at the "nature of the work." This factor "recognizes that creative works are 'closer to the core of intended copyright protection' than informational and functional works, 'with the consequence that fair use is more difficult to establish when the former works are copied." *Dr. Seuss Enters, L.P. v. Penguin Books USA, Inc.*,109 F. 3d 1394, 1402 (9th Cir. 1997). Here, the creativity, imagination and originality of the Sound Recordings tilts the scale against fair use. *Id.* at 1190. The Interviews were not information or functional, but rather a creative work. Woodward himself concedes the critical nature of the creativity imbued by hearing and reading President Trump's words as articulated by the speaker rather than the biographer. Modulation is the key in that the power, pitch, pause, pace and overall tone color of President Trump's narrative, as spoken by him in his unique style, was the motivating factor in its publication.

President Trump is currently one of the most mimicked, and often lampooned, public figures, which is largely due to his stream-of-consciousness style of speaking with repetition and emphasis of certain words but is undoubtedly unique in its creativity.[12] To academics of linguistics this is known as his "idiolect," the idiosyncratic form of language that is unique to an individual and there have been publication on this specific subject such as *Talking Donald Trump: A Sociolinguistic Study of Style, Metadiscourse, and Political Identity* by Jennifer Sclafani (Routledge 2018).

Part of this analysis is whether the copied work is unpublished. *Dr. Seuss Enters, L.P.*, 983 F. 3d 443 (noting that the unpublished nature of a work is a key, though not necessarily determinative, factor, tending to negate a defense of fair use.) "Under ordinary circumstances, the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Harper & Row,* 471 U.S. at 553. The Interview Sound Recordings was a creative work, interviews, that President Trump could publish. He had a right to do so. This factor weighs heavily in favor of Plaintiff.

**(c) Factor 3: Amount and Substantiality of the Portion Used in Relation to the Copyrighted work as a Whole.**

---

[12]      https://www.vox.com/policy-and-politics/2017/1/11/14238274/trumps-speaking-style-press-conference-linguists-explain

This factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" "are reasonable in relation to the purpose of the copying." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 587 (1994). Part of the analysis is the quantity and value of the materials used; "this factor calls for thought not only about the quantity of the materials used, but about their quality and importance." *Id.* The Supreme Court has agreed that whether a substantial portion of the infringing work was copied verbatim from the copyrighted work is a relevant question. *See id.* "The more of a copyrighted work that is taken, the less likely the use is to be fair [and] even a less substantial taking may be unfair if it captures the essence of the copyrighted work." *See Infinity Broad Corp v. Kirkwood*, 150 F. 3d 104 (2d Cir. 1998) (citing *Harper & Row*). "Generally, it may not constitute a fair use if the entire work is reproduced." *Id.* (citing Nimmer on Copyright, § 13.05[A][3] at 13-178 (1997)).

Here, Defendants have taken the Interview Sound Recordings in their entirety to publish the Audiobook and the Derivative Works. That does not coalesce with the fair use doctrine. *See Associated Press v. Meltwater U.S. Holdings, Inc.,* 931 F.Supp.2d 537, 558 (S.D.N.Y. 2013). (*"appropriation of a copyrighted work in its entirety weighs against a finding of fair use"*)*; Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2d Cir. 2006) ("[n]either our

court nor any of our sister circuits has ever ruled that the copying of an entire work favors fair use.")

The Audiobook and Derivative Works are entirely predicated upon the Interviews; the interviews were reproduced wholesale; to the extent the Defendants claim the reproduction is not wholesale, the Defendants were tasked with producing the Interviews, but they have not done so. The fact that the interviews were copied verbatim is confirmed by the Defendants' own admission that the Work "at times," breaks frame from the interviews. *See supra.* The admitted wholesale copying of the interviews was not necessary to newsreport, comment, or critique.

**(d) Factor 4: Effect of Use upon Potential Market for or Value of Copyrighted Work.**

The fourth fair use factor considers the effect of use upon a potential market for or value of the copyrighted work. 17 U.S.C. § 107(4). This factor

> requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether [****42] unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original. Nimmer § 13.05[A][4], p. 13-102.61 (footnote omitted); accord, *Harper & Row*, 471 U.S. at 569; Senate Report, p. 65; *Folsom* v. *Marsh*, 9 F. Cas. at 349. The enquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Harper & Row, supra*, at 568.

*Campbell*, 510 U.S. at 590.

Market harm may be presumed here. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984) (holding that "every commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright"). "A presumption of market harm "makes common sense[ ] when a commercial use amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591; *see also Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1155 (9th Cir. 1986) (where the defendant has used an entire work, it is likely that the secondary use will supersede the original in the market). Because the Defendants' use constituted a mere duplication of the original Interview Sound Recordings, market harm may be presumed here.

Defendants' use impairs the actual market for the Interview Sound Recordings because the Work serves the very same purpose as the Interview Sound Recordings. *See Associated Press*s, 931 F.Supp.2d at 559 ("Where there is a fully functioning market for the infringer's use of the copyrighted material, it will be difficult for the infringing party to show that it made fair use without paying a licensing fee") (citing *Harper & Row*, 471 U.S. at 566 n. 9).

Defendant published the Interview Sound Recordings without release by or remuneration to President Trump. The publication of the Interview Sound Recordings rendered it unlikely that the market would purchase the Interview sound Recordings from Plaintiff and diminished any licensing value of the copyright. Defendant's use therefore supplanted the normal market in which President Trump had a reasonable expectation to earn licensing revenue. Moreover, Defendants' use impairs the potential market for the Interview Sound Recordings because "unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in the substantially adverse impact on the potential market for [licensing of] the original." *Campbell*, 510 U.S. at 590 (internal quotation omitted). Here, because the Defendants engaged in wholesale copying of the Interviews, any authorized market for the original work was severely reduced or even eradicated. The Defendants' conduct undermined President Trump's opportunity to exploit the value of his copyright during its peak demand in the marketplace. For the foregoing reasons, the fourth fair use factor should weigh heavily in Plaintiff's favor.

Defendants do not delve into an analysis of these elements, and instead focus entirely upon the impossibility of a market for Presidents for interviews conducted during the presidency. Defendants assert a bright line rule against a

former president's copyright protection which, as set forth above, does not exist.[13]

Defendants seem to conflate the phrase "historical record" with "fair use," but the former is not part of the analysis. The claim that the Work was published for the "historical record" is not only a later contrived defense but one that it unknown at law. Simply stating that an infringement or violation is justified because it is for the "historical record" is completely and utterly meaningless and would justify any and all matter of infringements. Secondly, the Compendium *prima facie* disagrees; otherwise, it would not give a presumptive copyright for an interviewee. *See supra.* Thirdly, oral historians as a matter of best practices require releases in advance of publication. *See* Neuenschwander, John A.. A Guide to Oral History and the Law (Oxford Oral History Series) Second Edition (2014) (p. 132). Oxford University Press. Kindle Edition. "Interviewees hold the copyright to their interviews until and unless they transfer those rights to an individual or

---

[13] One aspect which the fair use analysis does not consider fully is the nature of releases and the voice over market as a whole in which written releases are the bedrock of the industry. For a major publisher to publish a voice work without the written release of the narrator or artist would be outrageous in the normal course of events, as it denudes the narrator of control of the use of his or her voice and the nature of the publication. Moreover, the nature of the publication often dictates the nature of the read, in that the manner of articulation and word choice is different if the narrator knows it is for dissemination in the recorded form.

institution. This is done by the interviewee signing a release form or in exceptional circumstances recording an oral statement to the same effect."[14] According to oral historians, their role does not give carte blanche to ride roughshod over copyright.

The "historical record" defense is also belied by the fact that publication of the Interview Audio Recordings "was an unusual step," for profit, not contemporaneous with the statements made, after publication of the originally intended work, which contained the relevant information. *See* Garson Declaration at ¶ 10. If Presidents have no rights whatsoever in their interviews, there would be nothing unusual about the publication. However, the Audio Recordings were clearly special and unique - unique enough for the Defendants to push their publication in various media. *See id.*

**IV.   President Trump's claims against the Defendants are not subject to preemption.**

**A. President Trump's claims are not barred by preemption via the government works doctrine.**

---

[14] The Oral History Association's 2009 statement on "Principles and Best Practices" fully expects oral history participants to sign over their rights as part of the standard procedure for conducting interviews: "The interviewer should secure a release form, by which the narrator transfers his or her rights to the interview to the repository or designated body, signed after each recording session or at the end of the last interview with the narrator." https://oralhistory.org/about/principles-and-practices-revised-2009/

Defendants argue that the government works doctrine preempts President Trump's claims.   However, for the reasons already set forth above, the government works doctrine is irrelevant here. The preemption argument is entirely premised on the incorrect assumption that President Trump cannot be an author and cannot hold copyright. The two are not mutually exclusive. The state claims stand independently of the copyright claims and this case would not fall with an adverse determination on copyright.

Modelling this out, if the Court were to rule that either there was a government works exception which removed copyright protection for Plaintiff and diluted Woodward's copyright interests, or even that Woodward was the sole owner, the contract, unjust enrichment and other claims in equity and law stand nevertheless. The recordings themselves and the representations contained therein give rise to a *prima facie case* that Woodward obtained the recordings based on certain representations and circumscribed his use of the recordings, accordingly. To give an example, a voiceover artist agrees to lend her voice to an audio project for certain markets; the publisher uses the recording in other markets, outside of the agreed-to scope. While the copyright may be determined to lie with the publisher, the artists would still have claims in contract, unjust

enrichment and the like. The difference is how damages, disgorgement and the like are proved and calculated.

## B. President Trump's state claims are not barred by 17 U.S.C. § 301.

"Claims fall outside the general scope of copyright, and thus are not preempted, when "an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action." *Foley v. Luster*, 249 F.3d 1281, 1285 (11th Cir. 2001) (quoting *Computer Assocs. Int'l v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). Importantly, the defendants do not dispute they never obtained a release from President Trump in writing or orally and proceeded to publish regardless. *See* Am. Compl. at ¶¶ 43, 51.

The unjust enrichment claims are pled in the alternative to President Trump's contract claims and seek relief should the Court find no contract exists. *Found. for Lost Boys & Girls of Sudan, Inc. v. Alcon Entm't, LLC*, 2016 U.S. Dist. LEXIS 183684, *29-30. As the claims meet the extra element, and a different analysis is required, they are not preempted. These claims center on the oral representations made by Woodward, the understanding of each of the participants when agreeing to being recorded, the legitimate expectations of the participants when the recording was made, the subsequent behavior of the

defendants, whether they come to equity with clean hands, whether disgorgement is appropriate, whether the defendants have the right to any offset in quantum meruit. For the purposes of quantum meruit, many of the above factors would also be considered, in addition, the Court would also consider the time commitment by the Plaintiff, the "going rate" for a narrator of his standard, quality and notoriety, analysis of industry standards in order to be able to determine liability in the absence of a release and quantum of damages.

Both the unjust enrichment and *quantum meruit* claims contain an "extra element" that precludes a preemption situation. *See PHA Lighting Design, Inc. v. Kosheluk*, No. 1:08-CV-01208-JOF, 2010 U.S. Dist. LEXIS 30752, 2010 WL 1328754, *10 (N.D. Ga. Mar. 30, 2010) ("The Copyright Act requires no such showing that the unauthorized copying unjustly enriched the copier.") (citation omitted); *see also Butler v. Cont'l Airlines, Inc.*, 2001 U.S. Dist. LEXIS 20295, 2001 WL 1509545, *3 (S.D. Tex. Nov. 19, 2001) ("equitable claims relating to breach of contract ... [including] *quantum meruit* ... satisfy the extra element test," as the claims are based on a contractual arrangement between the parties, instead of centering on the unauthorized use of" copyrightable material and the "claims arise from rights under the agreement"); *Found. for Lost Boys & Girls of Sudan, Inc.*, 2016 U.S. Dist. LEXIS 183684, *31-32 (N.D. Ga. 2016); *Poet Theatricals Marine, LLC v. Celebrity*

*Cruises, Inc.*, 515 F. Supp. 3d 1292, 1304 (Fla S.D. 2021); *Poet Theatricals Marine, LLC v. Celebrity Cruises,* 2023 US App. LEXIS 11836 (11th Cir. 2023) (Copyright Act does not completely preempt unjust enrichment claim; the elements of the case are not the same.)

**V.    President Trump's state law claims are sufficient to state a cause of action.**

**A. Breach of Contract**

Defendants' argument against the Plaintiff's breach of contract claims suffers from several defects.

(i)     "For the book"

First, the evidence before this Court is that Woodward materially averred and promised President Trump that the Interviews would be used only for the book *Rage. See* Am. Compl. at ¶¶ 49-50. If Woodward has a different account of events, that gives rise to a factual dispute that cannot be resolved via a Rule 12(b)(6) motion.

Defendants make unjustified conclusions about "the only relevant limitation based on the context," *see* Defendants' Mem. at p. 37, but they do not provide any meaningful context. Moreover, their interpretation of the context is

not only deeply skewed but also is an inherently factual matter, not one that may be resolved at this early stage of litigation.

    (ii)     Statute of Frauds and breach of contract.

Defendant's statute of frauds claim is devoid of any merit. It is premised on the fallacy that the asserted agreement "prohibit[ing] [Woodward's] reuse of the Interviews extended into perpetuity. *See* Defendants' Mem. at p. 38-39. The predicate of the agreement is not a prohibition, but rather an allowance. The agreement was to permit Woodward to use President Trump's interview for the purpose of a single book, i.e. *Rage*, not to prohibit him from publishing indefinitely. That book could have been, and was in fact, published within a year. *See* Woodward Declaration at ¶ 16. D.E. 37-1. Whereas allowance contemplates being able to do something that a person otherwise does not have a right to do, prohibition refers to having a right to do something and being precluded from doing it. The former applies here, while the latter has nothing to do with this case. The Defendants' analysis on this point is emblematic of looking at the horse from the wrong end.

    (iii)    Claims for promissory estoppel and breach of covenant of good faith and fair dealing.

Defendants' argument for dismissal of these claims is as febrile as it is short.  Claims for promissory estoppel and breach of covenant of good faith and fair dealing are not a restatement of the breach of contract claim but are permissible statements in the alternative. *See, e.g.*, *Senter v. JP Morgan Chase Bank, N.A*, 810 F. Supp. 2d 1339, 1362 (S.D. Fla. 2011).

### B.  Unfair competition and FDUPTA

(i)     Fallacy regarding non-commercial speech.

For the FDUTPA to apply, the alleged violation must have taken place "in the conduct of any trade or commerce," which is defined as "the advertising, soliciting, providing, offering, or distributing" of goods, services, property, "or any other article, commodity, or thing of value." Fla. Stat. §§ 501.203(8), 501.204(1). Where the allegedly violative action is the publication of information, the statute applies only to commercial speech—or, "expression related solely to the economic interests of the speaker and its audience." *Tobinick v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (quoting *Central Hudson Gas & Elec. Corp. v. Pub Serv. Comm'n of N.Y.*, 447 U.S. 557, 561, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)). *See Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020).

Defendants' argument against the FDUPTA claim is premised on non-commercial speech being categorically exempt from FDUPTA liability; however,

this argument presupposes that the works at issue are non-commercial speech. Despite Defendants' ubiquitous invocation of the dubious, later-contrived "historical record" defense, the Defendants fail to show that the subject work is anything short of commercial.

Additionally, FDUPTA applies to action that occurred within the state of Florida, but not only "where the primary conduct at issue occurred," as Defendants suggest. *Compare* Motion to Dismiss at p. 39 with *Carnival Corp. v. Rolls-Royce PLC*, 2009 U.S. Dist. LEXIS 107261, at *18 (S.D. Fla. Nov. 17, 2009). Defendants state the "primary conduct" occurred outside of Florida, but this is nothing more than an empty conclusory statement. This statement also glosses over President Trump's residence in Florida and the fact that a portion of the interviews took place in Florida. *See* D.E. No. 37-2 and Garson Declaration at ¶ 21.

(ii)    Identification of actual consumer.

Moreover, none of the authorities cited by the Defendants supports any obligation to identify, on the face of the complaint, an "actual consumer." Indeed, the Defendants' authorities are rooted in the summary judgment stage, not the motion to dismiss stage. *See* Defendants' Mem. at p. 40.   The governing law requires a defendant to set forth an act likely to mislead a consumer to a

consumer's detriment, and the Plaintiff has done that here. *Garrett-Alfred v. Facebook, Inc.*, 540 F. Supp. 3d 1129, 1142 (M.D. Fla. 2021).

(iii)    Claim duplication.

Defendant's duplication claim fails. President Trump is permitted to argue in the alternative. Moreover, the Defendants' perception that there has been no injustice cannot be dispositive of the Plaintiffs' claims. The Defendants are essentially contradicting President Trump's allegations regarding the purpose, scope and limitations of the Interviews. By creating that conflict, the Defendants are demonstrating why they are not entitled to relief under Rule 12(b)(6). Importantly, if the Defendants claim that the title of the work reflects President Trump's contributions to the Work, the question arises why the Defendants have not remitted any payment to President Trump for that contribution, and why they are contesting President Trump's rights to the Works. Discovery is clearly a necessary precursor to any attempt by the Defendants to dismiss the Plaintiff's claims.

**VI.    Claims against Paramount Global.**

The Defendants claim in elementary fashion that the allegation that Paramount exerts direct control over the executive leadership is insufficient. *See* Defendants' Mem. at 41-42; Am. Compl. at ¶ 17.   First and foremost, the

Plaintiff's pleading on this point is, as required, a short and plain statement of the facts. Secondly, this claim of insufficiency is belied by public record showing that, over the past two years, Paramount has attempted to sell off SSI on a number of occasions:

> In the fourth quarter of 2022, we terminated the agreement after the U.S. Department of Justice prevailed in its suit to block the sale. Simon & Schuster remains a noncore asset as it does not fit strategically within our video-based portfolio. We expect to enter into a new agreement to sell Simon &Schuster in 2023. Assuming that we do so, closing would be subject to closing conditions that would include regulatory approval. Simon & Schuster continues to be presented as a discontinued operation for all periods presented.

*See* 10-Q filing, attached as Exhibit D to the Garson Declaration.

It is thus clear from public filings that Paramount was exercising its right and ability to supervise beyond the parent-subsidiary relationship and trespassed into day-to-day control. *Bennett v. Tu-Cows, Inc.,* 2007 U.S. Dist. LEXIS 54816, 2007 WL 2178317, at *6 (E.D. Mich. July 27, 2007) (citations omitted). Close scrutiny was being applied by Paramount particularly as, despite being presented as a discontinued operation, for the purposes of Paramount's credit facility, it was in fact treated as a continuing operation for the purposes of calculating Consolidated EBITDA until its disposition. *See* 10-Q filing at p. 16.  This treatment allowed Paramount as a whole meet to principal financial covenant of its leverage

ratio. Failure to meet such a covenant would have been perilous for Paramount. These publicly available documents show that for the purposes of Paramount's liquidity, the projected sale of SSI was a key consideration for liquidity and capital resources; the sale was necessary for increased investment in streaming services. *See* 10-Q filing at p. 41. In effect, the publicly available evidence demonstrates direct control by Paramount over the finances of SSI.  Moreover, Woodward is indisputably one of SSI'S championed authors, and the publication of a high-profile title during sale of the company (i.e., the Work) is something which Paramount would have undoubtedly been aware of and directly involved with.

In effect, to the extent Defendants are seeking "indicia beyond the mere legal relationship showing that the parent is actually involved with the decisions, processes, or personnel directly responsible for the infringing activity," *Banff Ltd. v. Limited, Inc.*, 869 F.Supp. 1103, 1109 (S.D.N.Y. 1994), that indicia is before the court, and will be solidified through the discovery process.

## VII.   Conclusion

For the reasons set forth herein, the Motion should be denied.

Dated: June 30, 2023
Aventura, Florida

> **GS2 LAW PLLC**
> By: /s/ Robert Garson
> Robert Garson, Bar No. 1034548
> Yanina Zilberman, Bar No. 105665
> 20803 Biscayne Blvd., #405
> Aventura, Florida 33180
> (305) 780-5212
> rg@gs2law.com; yz@gs2law.com
> *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, I filed the foregoing Response, which will

send an electronic notice to counsel of record per the service list below.

> /s/ Robert Garson

**Service List**

**GUNSTER, YOAKLEY & STEWART, P.A.**
Kenneth B. Bell (FBN 347035)
Lauren v. Purdy (FBN 93943)
One Independent Dr., Suite 2300
Jacksonville, FL 32202
Phone: (904) 354-1980
Email: kbell@gunster.com
        lpurdy@gunster.com

**DAVIS WRIGHT TREMAINE LLP**
Elizabeth A. McNamara (NYBN 1930643)
Linda J. Steinman (NYBN 2137305)
John M. Browning (NYBN 5213038)
Leena Charlton (NYBN 5622147)
1251 Avenue of the Americas, 21st Floor
New York, NY 10020
Phone: (212) 489-8230
Email: lizmcnamara@dwt.com
        lindasteinman@dwt.com
        jackbrowning@dwt.com
        leenacharlton@dwt.com

*Attorneys for Robert Woodward,*
*Simon & Schuster, Inc. and Paramount Global*

## CERTIFICATION OF WORD COUNT

I hereby certify that this Response in Opposition complies with Rule 7.1(F) of the Local Rules for the Northern District of Florida and this Court's order granting permission to file an oversized document, not to exceed 10,000 words. Dkt. 22.

According to the word-processing system used to prepare this Response in Opposition, the total word count for all printed text exclusive of the material omitted under Rule 7.1 is 9710 words.

By: /s/ Robert Garson